Cobb, Respondent, vs. Simon, Appellant.

*October 24—November 17, 1903.*

*Master and servant: Liability for servant's torts: Scope of employment: Floorwalker in store: Searching customer for stolen goods: Instructions to jury: Ratification of servant's acts: Retention in employment: Court and jury: Attorney and client: Privileged communications: Excessive damages.*

1. Where it was the duty of a floorwalker in a department store to watch customers and to take stolen merchandise away from those whom he discovered in the act of stealing, and in endeavoring to perform this duty, acting upon the honest belief that a customer had stolen property in the store, he locked her in a room and searched her, his employer is liable for such acts, because they are within the scope of the employment.

2. But if the floorwalker knew that the customer had not stolen anything, and falsely or by a trick made it to appear 'that she had, and imprisoned and assaulted her in order to extort money from her, the employer is not liable for any of such acts, because in doing them the floorwalker stepped aside from his employment and committed a tort for his own purposes.

3. An instruction to the jury, in such a case, that "a master is. liable for a wrong done by his servant, whether through negligence or malice of the latter, in the course of an employment in which the servant is engaged to perform a duty which the master owes to the person injured," is *held* so inapplicable to the relations between a merchant and the customers in his. store that the giving thereof was error.

4. Instructions, to be helpful to a jury, should not merely state the law in general terms, but should specifically apply it to the facts of the case as the jury may find them to be.

5. The question being whether defendant had ratified the acts of his floorwalker in imprisoning plaintiff and searching her for stolen goods, and the only fact in evidence from which such ratification could have been rightfully found being the retention of such floorwalker in his employment after defendant had been informed of plaintiff's story, an instruction that ratification may be signified by acts of omission as well as of commission, is *held*, while correct as a general proposition, to have been misleading and prejudicial, since under it the jury might well have found ratification from acts or omissions entirely inadequate for that purpose, such as the mere omission of defendant to go to see the plaintiff after being informed of her story.

6. Retention of a servant in his employment after notice to the employer of a tortious act of the servant is evidence of ratification of the act; but to justify the conclusion of ratification the information to the employer should be full and complete.

7. It is not essential in such a case that the information should come from the injured person, but however it comes it should be so convincing and persuasive as to convince the mind of an ordinarily prudent employer that the facts exist which call for the servant's discharge.

8. The question of ratification in such a case is generally one for the jury, in view of all the information which came to the employer.

9. An employee having been arrested and prosecuted criminally for an assault upon one of his employer's customers, the employer called upon the assistant district attorney with reference to the. matter. Afterwards, in an action by the injured person against the employer, said attorney was permitted to testify that in that conversation with the employer he stated to the latter the plaintiff's version of the transaction. *Held*, not error. The relation of attorney and client did not exist between the employer and the prosecuting attorney, and hence the communication testified to was not privileged.

10. In an action based upon the unjustifiable acts of defendant's
employee in locking plaintiff in a room and searching her for
stolen goods, where there was no physical violence and no cir-
cumstances of public disgrace or insult, and, though the evi-
dence tended to show that plaintiff suffered from heart diffi-
culty, weakness, and headache as the result of the occurrence,
she testified that she could do her own housework and that
she was not "nearly so bad as at first," a verdict for $2,500 is
*held* excessive, and it is said that upon such evidence any ver-
dict exceeding $1,000 would be so regarded.

Appeal from a judgment of the circuit court for Milwau-
kee county: Orren T. Williams, Circuit Judge. *Reversed.*

This is an action for assault and false imprisonment. The
facts were not seriously in dispute. June 18, 1900, the de-
fendant was the proprietor of a large department store in
Milwaukee, in which there were employed four floorwalkers
and more than 300 clerks. On the last-named day the plaint-
iff, a married woman living in Sheboygan county, entered
the defendant's store with her daughter Jennie Buscher, who
lived in Milwaukee, to do some shopping. They went first
to the lace counter and bought some lace, and then bought
some dimity at another counter, after which they inquired
of one Julius Saxe, one of the defendant's floorwalkers, for
the muslin department. Saxe went with them to the muslin
counter, where they bought muslin, and afterwards some
soap at another counter; Saxe receiving the money for a
part, at least, of the purchases. From the soap counter they
passed out of one of the outer doors of the store onto the side-
walk, and Saxe followed them. The daughter thus describes
what then took place:

"We were three feet away from the outer door of the ves-
tibule on the sidewalk, when Saxe stopped us—tapped me
on the shoulder. I looked around to see what he wanted and
who he was. He asked me for the lace. I handed him the
package of lace I had purchased. He said: 'That is not the
lace I want. It is the lace you stole.' I said I did not steal
any lace. Then he stepped around sort of back of me and

my mother, who stood at my left, almost directly in front of me, and then he apparently took a bolt of lace of about twelve yards from under her arm, made such a movement, and said, 'Here it is.' That is the first I had noticed or seen anything of it. After he spoke about this, he asked us to come back into the store with him. I turned around and faced him—he was standing almost next to the door, just outside, so people could go in and out—and he said, 'Come back into the store,' and we went."

It further appears by the daughter's testimony that the plaintiff and her daughter followed Saxe back into the store and downstairs into a small room, where Saxe shut and locked the door, and tore open the front of the plaintiff's dress to see if he could find stolen goods, accusing them at the same time of stealing lace, and saying that he would send them to a police station unless they paid him $50; that they were kept there nearly half an hour; that plaintiff denied stealing the lace, and finally they gave Saxe all the money they had, amounting to $15, and he let them out. The plaintiff herself did not attempt to describe the arrest and subsequent transactions, except to say that Saxe stopped them and took them down cellar, and that she sat on a bench, and was unable to walk without help when released. It appeared that Saxe died July 24, 1902, and that his testimony was never taken. There was testimony tending to show that the plaintiff's health was good before the assault, and that since that time she has had palpitation of the heart and nervous weakness.

The jury returned the following special verdict:

"(1) Did the plaintiff sustain an injury on the 18th day of June, 1900, at the defendant's store, known as the 'Boston Store,' in the city and county of Milwaukee, at the hands of one J. H. Saxe? A. (by consent of all parties) Yes. (2) Was the said J. H. Saxe on the 18th day of June, 1900, in the employ of the defendant, *Julius Simon,* as floorwalker? A. (by consent of parties) Yes. (3) Were the acts causing the plaintiff's injury done by said J. H. Saxe

when acting within the scope of his employment by the defendant? A. Yes. (4) Did the defendant ratify the acts of said J. H. Saxe toward the plaintiff, after having learned the fact? A. Yes. (5) If the court should be of the opinion that the plaintiff is entitled to recover compensatory damages, at what sum do you assess the plaintiff's compensatory damages herein? A. $2,500. (6) If the court should be of the opinion that the plaintiff is entitled to recover, in addition to compensatory damages, punitory or exemplary damages, at what sum do you assess the plaintiff's exemplary or punitory damages? A. None."

The defendant moved to set aside the verdict and for a new trial, but the motion was overruled and judgment for the plaintiff entered, from which the defendant appeals.

For the appellant there was a brief by *Fiebing & Killilea* and *Theodore Kronshage, Jr.,* attorneys, and *Oscar M. Fritz,* of counsel, and oral argument by *Mr. Kronshage.*

For the respondent there was a brief by *D. T. Phalen,* attorney, and *Simon Gillen* and *Ernest A. Kehr,* of counsel, and oral argument by *Mr. Gillen.*

WINSLOW, J. The undisputed evidence showed that Saxe was guilty of assault and false imprisonment, and the serious questions in the case were whether the defendant was shown to be liable for the acts of Saxe, either because they were within the scope of his employment or because the defendant ratified such acts after knowledge.

The principle is well understood that the master is liable for the negligent or wrongful acts of his servant committed in endeavoring to perform a duty delegated to him by the master, and this is so notwithstanding the method adopted by the servant may not have been authorized, and may even have been prohibited, by the master. On the other hand, it is equally well understood that if the servant steps aside from his master's business, and maliciously or wantonly commits a tort for the accomplishment of his own purposes, the

master is not liable for such acts. The test is not whether the act was done during the existence of the employment, but whether it was done in the prosecution of the master's business. *Bergman v. Hendrickson,* 106 Wis. 434, 82 N. W. 304.

The scope of Saxe's duties was thus stated on the trial by the defendant:

"It was a part of Mr. Saxe's business to watch customers and prevent them from doing any wrongful acts in the store. It was not a part of his employment or business to settle with them or take from them in case he found anything. If he discovered any one in the act of stealing, *he was either to take the merchandise away from them,* or call the police patrol, or have them arrested, as we have done in very many cases."

And again he says:

"Mr. Saxe's duties in reference to persons suspected of stealing were either to prohibit them from taking the goods when they did not pay for them, or else call for the police and arrest them if they insisted upon it."

Thus it appears that it was Saxe's duty to watch customers and prevent them from doing wrongful acts; also to take stolen merchandise away from customers whom he discovered in the act of stealing. Now if, as matter of fact, Saxe honestly believed that plaintiff had stolen a bolt of lace or other property in the store, and, acting on that belief, imprisoned the plaintiff and searched her, it seems clear that as to these acts, at least, the defendant would be liable, within the rule of the *Bergman Case,* because the servant was attempting to carry out his duty of taking merchandise away from a customer whom he supposed was in the act of stealing it, though using means not authorized by the master. On the other hand, if the servant knew no merchandise had been stolen, but falsely or by a trick made it appear that the plaintiff had the lace under her arm, and imprisoned and assaulted.

her in order to extort money from her, the defendant would not be liable for any of his acts, because Saxe had stepped aside from his employment to commit a tort for his own purposes and ends. The defendant strongly claims that the evidence shows the latter state of facts, without dispute, and hence that the third question of the verdict should not have been submitted to the jury. This claim is not without considerable weight. Saxe's version of the transaction was never given, and we have really only the version given by the plaintiff's daughter. She testifies that Saxe stepped back of the plaintiff and apparently took a bolt of lace from under her mother's arm, and said, "Here it is," and that she had not seen anything of it before. A legitimate inference from this evidence, doubtless, is that Saxe produced the lace by some trick or sleight of hand, but is this inference conclusive? The daughter does not say that the lace was not in fact under her mother's arm, nor does she testify that Saxe produced it by a trick; and the plaintiff herself does not testify at all as to the matter, though she must have known what the fact was, and was on the stand as a witness twice. In this situation of the evidence, we think it would be going too far to hold that the inference of a trick by Saxe is conclusive. Upon another trial such fact may perhaps appear, but, as the evidence stands upon this trial, we think it was a question for the jury under proper instructions.

This brings us to a consideration of the instructions given by the court upon the third question. The instructions were in part as follows:

"A man acts within the scope of his employment when the motive which impels him is the performance of a duty with which he is charged by his employer. His method of performing that duty may not have been expressly authorized or have been contemplated, and may have been expressly prohibited; but his acts would be within the scope of his employment, provided he was intrusted with the duty he was

attempting to perform. The test of the scope of employment is the purpose of the act and not its method. Was the object of the act the performance of a duty resting upon the servant? If it was, then the act was within the scope of his employment; otherwise not. A master is liable for a wrong done by his servant, whether through negligence or malice of the latter, in the course of an employment in which the servant is engaged to perform a duty which the master owes to the person injured."

As to all of these instructions, except the last sentence, there is no serious difficulty. They are quite general in their nature, and not as helpful to the jury as more specific statements, such as are contained in the preceding portions of this opinion, would be, but we are unable to say that they are erroneous. We cannot regard the last sentence quoted, however, as in any way applicable to the present case. It would be applicable in the case of an assault upon a passenger by one of the servants of a common carrier, because in such case the common carrier owes the duty to the passenger of transporting him safely and protecting him against injury, including injury from the hands of the carrier's own servants. This principle and its reasons are well understood. *Craker v. C. & N. W. R. Co.* 36 Wis. 657; Wood, Master & Servant (2d ed.) § 321. It has not, however, been applied to a merchant in his relations to customers. It is true that customers in such case are upon the premises by invitation, and the merchant owes the positive duty to the customer of using ordinary care to keep the premises in a reasonably safe condition for use by the customer in the usual way; and this doubtless includes the duty of using ordinary care to employ competent and law-abiding servants, but we do not understand that he insures the customer's personal safety. We have been referred to no cases so holding. The general principle as frequently stated is that persons who come upon premises to do business with the occupant at his express or implied request are there by invitation, and that they are entitled to

the same treatment due to all invited persons, namely, the exercise of ordinary care by the occupant. *Hupfer v. National D. Co.* 114 Wis. 279, 90 N. W. 191. We therefore conclude that it was error to give the sentence in question to the jury in this case, because the case was not one where it could rightly be applied.

Upon the fourth question the court charged the jury as follows:

" 'To ratify' means to confirm or approve of, and such ratification may be signified by acts of omission as well as of commission—negatively as well as affirmatively. So, in deciding this question, you may consider what the defendant. did not do that he should have done if he desired to disaffirm, as well as what he did do indicative of affirmance or disaffirmance; and you will notice the last part of the question. This ratification or affirmance, if it took place, must have taken place, in order that you may answer this question in the affirmative, after having learned of the facts. You will answer that question 'Yes' or 'No,' as you determine the fact to be from all the credible evidence in the case."

Here, too, it will be noticed that the language is very general. There is no positively erroneous statement in it, but in what respect does it enlighten the jury? They were informed that ratification might be signified by acts of omission as well as by acts of commission, but they were no wiser than before with regard to what acts of omission or commission would constitute ratification. The helpfulness of a charge lies in the application of the law to the facts of the instant case. It does little good to tell a jury that ratification may be signified by acts of omission, and to scrupulously refrain from telling them what acts of omission are meant. Not only does such a charge do little good, but it may become absolutely misleading. For instance, in the present case the only fact in evidence from which ratification could have been rightfully found was the fact (testified to by the defendant, but afterwards partially contradicted by him)

that he retained Saxe in his employ after he had been informed of the plaintiff's story. This being the only testimony on which ratification could be predicated, the jury should have been told under what circumstances retention of the employee constitutes ratification. On the contrary, they seem to have been set adrift without compass or sextant upon an uncharted sea, and allowed to select any act of omission or commission which they chose, and predicate ratification upon it. The vice in this very clearly appears from a moment's consideration of one piece of testimony. Upon cross-examination, the defendant testified that he never went to see the plaintiff after being informed of her story. This was certainly an act of omission. The jury would not have been justified in finding ratification from this fact alone, yet, under the charge, they may well have done this very thing. We cannot but think that, while the language of the charge is not erroneous in law, still, when taken in connection with the facts of the case, it is positively misleading and prejudicial, because it allows the jury to find ratification from acts or omissions which are entirely inadequate for that purpose. Retention of a servant in his employment after notice to the principal of a tort committed by the servant is evidence of ratification of the act by the principal. *Bass v. C. & N. W. R. Co.* 42 Wis. 654; *Robinson v. S. R. T. R. Co.* 94 Wis. 345, 68 N. W. 961. The information to the principal should be full and complete, in order to justify the conclusion of ratification on this ground. *Palry v. C., St. P., M. & O. R. Co.* 77 Wis. 218, 46 N. W. 56. It is not essential that the information should come from the plaintiff, but however it comes it should be more than mere idle rumor and should be so convincing and persuasive as to convince the mind of an ordinarily prudent employer that the facts exist which call for the servant's discharge. Any other rule would necessitate the discharge of faithful employees whenever their conduct is assailed by irresponsible, unfounded gossip,

and such a rule would be plainly unjust both to employer and employee. The question is generally one for the jury, in view of all the information which came to the employer, and was such in the present case, under proper instructions.

A number of rulings upon evidence are assigned as error, but none of them are deemed well taken, and but one of them is regarded of sufficient importance to require special treatment. On the day after the assault upon the plaintiff, Saxe was arrested and prosecuted criminally for the offense; and the defendant, *Simon,* called on the assistant district attorney of Milwaukee county with reference to the matter. The assistant district attorney was placed on the stand by the plaintiff, and testified, against objection, that in that conversation he stated to the defendant *Mrs. Cobb's* version of the transaction at length. This ruling is now assigned as error, and the ground taken seems to be that the communications were privileged, because they were communications between attorney and client. This objection is plainly not well taken. There was no relation of attorney and client between the parties, and the defendant was not even a prosecuting witness. It was rather an attempt on the part of the defendant to explain matters to the prosecuting officer from the defendant's standpoint. We are aware of no rule which excludes such testimony.

We regard the damages awarded as clearly excessive. While the act, as shown by the evidence, was entirely unjustifiable, there were no circumstances of public disgrace or insult; nor was there physical violence. The testimony tended to show that heart difficulty, weakness, and headaches have resulted from the occurrence; but the plaintiff testifies that she does her own housework, except the washing, and that she is not nearly so bad as she was at first. Under the evidence, we should regard any verdict exceeding $1,000 as excessive.

*By the Court.*—Judgment reversed, and action remanded for a new trial.