Marlatt, Respondent, vs. Western Union Telegraph Company, Appellant.

*February 6—April 3, 1918.*

*Telegraphs: Divulging contents of news message: Property interest of sender: Damages: Mental anguish: Punitory damages: Ratification of agent's act: Questions for jury: Assessment of punitory damages discretionary.*

1. A newspaper reporter who, having a contract to furnish certain news to one paper exclusively, delivered the message to the telegraph company selected by that paper for its transmission, thereby parted with his property interest in such news, and cannot recover its value as an element of compensatory damages in an action against the company for divulging to other newspapers the contents of the message.

2. Nor can there be any recovery in such action for plaintiff's mental anguish or worry over the situation, whether the action be for breach of contract or in tort. Sub. 5, sec. 1778, Stats. 1915, fixing a maximum penalty for negligence of telegraph companies in receiving, copying, transmitting, or delivering messages is not applicable.

3. A telegraph company is not liable in punitory damages for the unauthorized and wilful act of its agent in divulging the contents of a message unless it ratified such act.

4. The question whether or not there has been a ratification of an agent's wilful act is generally for the jury; but the evidence may be so clear and uncontradicted that the court may decide the question as one of law.

5. A party is never entitled to have punitory damages assessed; their assessment, when the proper facts are shown, being in each case a matter within the sound discretion of the jury.

6. Where a telegraph company denounced the act of its agent in divulging the contents of a message and offered to discharge him, but was requested by plaintiff not to do so, and did not, it cannot be said to have ratified his act so as to be liable in punitory damages.

Appeal from a judgment of the circuit court for Kenosha county: E. B. Belden, Circuit Judge. *Reversed.*

Plaintiff, who was a newspaper reporter, had a contract to furnish exclusively to the Milwaukee Free Press the scores

of the state bowling tournament held at Kenosha, and filed with the agent of the defendant at that place messages containing such scores for transmission to Milwaukee to the Free Press. Defendant's agent, before sending the messages to the Free Press at Milwaukee, copied the scores and sent them by telegraph to the Milwaukee Journal, which paper published them at the same time they were published by the Free Press. Plaintiff sues for damages because he claims defendant's wrongful act of sending copies of the scores to the Milwaukee Journal resulted in an injury to his prestige and reputation as a newspaper reporter and as an honorable man, and in a diminution of his earning power as such reporter.

The jury by a special verdict assessed plaintiff's compensatory damages at $250 and his punitory damages at $3,000. From a judgment entered thereon in plaintiff's favor defendant appealed.

For the appellant there was a brief by *Bottum, Bottum, Hudnall & Lecher,* attorneys, and *R. N. Van Doren,* of counsel, all of Milwaukee, and oral argument by *Mr. Van Doren* and *Mr. George B. Hudnall.*

*Geo. W. Taylor* of Kenosha, for the respondent.

VINJE, J. Upon the question of compensatory damages the court instructed the jury that the elements thereof in this case were "the reasonable value of the information contained in the messages so wrongfully divulged by the defendant, which, according to the uncontradicted evidence, is $45, and such mental suffering as you are satisfied by the credible evidence was endured by the plaintiff, if any, because of anticipation of loss of business, and loss of prestige or standing as a newspaper correspondent, which you are satisfied might reasonably be apprehended under such circumstances as are shown in this case as the natural and proximate consequence of the defendant's wrongful act." The court correctly held

that there were no other elements of compensatory damages, for there was no evidence that plaintiff suffered any financial loss not included in the above elements.    He was unable to show the loss of a single contract or engagement, present or prospective, by reason of defendant's wrongful act other than the value of the messages divulged and his worry or mental anguish over the situation.    So the question recurs whether the elements submitted were proper.    Plaintiff alleges in his complaint and reiterates again and again in his evidence that his contract with the Free Press was an exclusive one; that he told Miller, the defendant's agent at Kenosha, that he could not furnish him the scores because his exclusive contract with the Free Press prevented him from letting any one else have them.    It is therefore evident that when he delivered the scores to the defendant, the agent selected by the Free Press for transmitting them to it, he surrendered control and possession of the property sold, and he no longer retained any property interest therein.    Such property interest was in the Free Press, and any divulgence of the contents of the messages was a violation of the property rights of it and not of the plaintiff.    This eliminates the value of the messages sent as an element of compensatory damages.

Is plaintiff entitled to recover for mental anguish or worry over the situation?    If the action be considered one for a breach of contract then he cannot recover.    *Walsh v. C., M. & St. P. R. Co.* 42 Wis. 23; *Koerber v. Patek,* 123 Wis. 453, 102 N. W. 40; *Frechette v. Ravn,* 145 Wis. 589, 130 N. W. 453.    If it be considered one in tort, then, independent of the statute, he cannot recover.    *Summerfield v. Western Union Tel. Co.* 87 Wis. 1, 57 N. W. 973.    For a collection of authorities on both sides of this question see opinions in *Western Union Tel. Co. v. Ferguson,* 157 Ind. 64, 60 N. E. 674, 54 L. R. A. 846 and note, and valuable notes in 49 L. R. A. N. s. 206–344.    The refusal of courts to allow damages for mental anguish alone is based on the ground that such damages are too speculative, vague, and subjective for assess-

ment by a jury, and that the incentive to capitalize grief
would be so great that more injustice than justice would re-
sult from the adoption of a rule allowing such damages.    The
only rational remedy is a recovery under statutory provisions
fixing a maximum penalty, as sub. 5, sec. 1778, Stats. 1915,
does for a failure or negligence of telegraph companies in
receiving, copying, transmitting, or delivering messages.
That statute, however, does not reach this case, as the default
of the defendant was outside the scope of its terms.    The
conclusion reached is that under the evidence plaintiff's com-
pensatory damages were nominal only.    Defendant asked
that the court fix them at one dollar.    This should have been
done.

While defendant's agent Mohr, at Milwaukee, directed
Miller, its agent at Kenosha, to secure the scores for the
Journal, it is admitted that there was no intention on Mohr's
part that they should be secured in other than a lawful man-
ner, and that Mohr did not know until some time afterwards
how they were secured.    Defendant, therefore, even if Mohr
could be considered as having authority to do so, did not di-
rect the unlawful divulgence of the message.    Did it ratify
the act afterwards?    If so, it could, in the discretion of the
jury, be punished by the assessment of punitory damages.
*Topolewski v. Plankinton P. Co.* 143 Wis. 52, 126 N. W.
554.    Generally the question of whether or not there has
been a ratification is for the jury.    *Cobb v. Simon,* 119 Wis.
597, 97 N. W. 276.    But the evidence relative thereto may
be so clear and uncontradicted that the court can say as a
matter of law that there has or has not been a ratification.
In the present case the trial court held plaintiff was entitled
to recover punitory damages, not because it found there had
been a ratification, but because the act of defendant's agent
was inexcusable, reckless, and wilful.    The court says in its
instructions to the jury:

"Because in the judgment of the court the wrongful act of
the defendant intentionally done by its employee or em-

ployees, without cause or excuse, shows such entire want of care as to raise the presumption of conscious, reckless, and wanton indifference to the rights of the plaintiff and the defendant's duty towards him, and such as is equivalent to an intentional disregard thereof, you are instructed that the plaintiff is also entitled to recover exemplary or punitory damages."

In this the court erred. The action was against the corporation, not against the agent. No matter how wilful may be the act of the agent, the corporation, in the absence of a direction on its part to do the act in the manner in which it is done, is not liable to punitory damages unless it appears that it ratified the conduct of its employee.

It should also be noted that it was error to instruct that plaintiff was *entitled* to punitory damages. When the proper facts exist without dispute, or are found by the jury to exist, then the jury *may* assess punitory damages. It is not compelled to do so. Whether punitory damages shall or shall not be assessed is a matter that must be left to the sound discretion of the jury in each case. The plaintiff is never *entitled* to have them assessed. *Robinson v. Superior R. T. R. Co.* 94 Wis. 345, 68 N. W. 961; *Topolewski v. Plankinton P. Co.* 143 Wis. 52, 126 N. W. 554.

This brings us to the question whether we can say as a matter of law that there was or was not a ratification of the agent's acts by the corporation, or whether that question should have been submitted to the jury.

The testimony on that subject is not in conflict and is given by plaintiff himself. After the tournament closed he sent a letter to Mr. Mohr demanding an investigation of the matter, and a day or two later he testified Mr. Miller came to him and the following conversation took place:

"Mr. Miller says: 'Well, I suppose you are going to put me in jail, are you?' I said: 'No, Miller, I haven't anything against you. I am awfully sorry that you saw fit to do this thing.' And Mr. Miller said: 'Well, I am blamed

for it; I will have to take it.' I said: 'Well, I have written to Mr. Mohr,' and he said he had been communicated with, I don't remember whether he said it was Mr. Mohr or Mr. Parmentier who had spoken to him about it. He said: 'I am going to lose my job.' I replied I was very sorry. I said I thought possibly Mr. Mohr was the man to blame, because I considered from his statement that Mr. Mohr had ordered him to do this."

About ten days afterwards Mr. Parmentier, on behalf of the defendant, came to plaintiff, and he narrates his conversation with him as follows:

"Mr. Parmentier came into my office and asked if I was *Mr. Marlatt.* I said 'Yes,' and he shut the door. He said: 'We have got an awful mix-up here.' I remember his conversation to this extent: He says: 'I have never in my life, as a telegraph operator, seen such a case as this; and for that reason we have been investigating it very closely.' He produced a report, which purported to be a statement of the various parties who had been connected with the transmission of messages between Kenosha and Milwaukee on the nights in question, showing the transmission of these messages both to the Milwaukee Free Press and to the Milwaukee Journal."

"Mr. Parmentier said: 'Now, *Mr. Marlatt,* this is a confidential report of this company, and I have no business to show it to you, but I am very anxious to get this matter settled up, and for that reason I am going to submit to you the whole facts in the case.' He then submitted to me the report, and I ran through a part of it, reading the part that purported to be a statement made by Manager Miller of his blame in the matter. After I had read portions of this report Mr. Parmentier said: 'Now, we are willing to do whatever you want us to do. We will discharge Miller and every man connected with the office, and make a clean-out of it.' I said: 'Why no, Parmentier, I don't care to have you discharge Miller and the rest of the fellows, and put in another bunch, and I would have to educate them.' I told Parmentier: 'What I want is Mr. Mohr.' Mr. Miller advised me that Mr. Mohr told him to get this stuff, and that he acted on Mr. Mohr's suggestion. Parmentier says: 'Well, Mohr is not coming to Kenosha.' After thinking the matter over I

said to Parmentier: 'Well, if Mohr won't come, I will get a warrant for Mohr, and we will get him here that way.' And Parmentier said: 'No, now, don't do that.' He says: 'I will go down and talk to Mohr.' Then Mr. Parmentier left the office, and he came back a half hour afterwards, and he said: 'What time can you meet Mohr and I tomorrow?' And I said: 'Any time you suggest.' He said: 'We will be here at half-past 2 o'clock.' I said: 'All right.' Then Mr. Parmentier left, taking the report with him. Mr. Parmentier had a great deal to say about how he was going to clean out the office, and of how this was the first time such a thing had been put over the *Western Union Telegraph Company* and how they were going to send notice to every operator of the company in the United States and Canada calling attention to it, and all that; that kind of conversation; I don't recall it all. It wasn't especially interesting to me. Mr. Parmentier urged me not to make any criminal prosecution, and gave Mr. Mohr a very high recommendation. He said Mr. Mohr was a perfect gentleman and had been with the company a long time and had never had anything to do with anything of this kind before; his name had never been drawn into such a thing. I suggested that I wanted Mr. Mohr brought to Kenosha. Mr. Parmentier came back, after he had talked with Mr. Mohr, and formally made an appointment for half-past 2. The same day he came back in the afternoon, after he had made his appointment with Mohr, I think, by telegraph, and he said: 'Now you won't do anything along this line until after we see you tomorrow?' I said: 'No, but I shall have the district attorney come over when you gentlemen come down tomorrow.' "

The conversation with Mr. Mohr and Mr. Parmentier the following afternoon he details thus:

"Well, Mr. Mohr came in and he said: 'Well, now, I don't know anything about this.' He said it was a matter of office routine. I don't know as it is his exact words. I question whether I could give them. Mr. Mohr said it was a matter of office routine with him, and he was not to blame for it at all, and he didn't know anything about it till the matter was called to his attention by Mr. Miller. Then Mr. Parmentier said: 'I told you Mohr was a good fellow.' I said: 'That is

all right,' and I called the district attorney on the telephone. I walked out of the office and called Mr. Drury. I says: 'We will continue that when he comes.' In the meantime Mr. Parmentier had laid the report down on the table again, and I picked it up and read portions of it." Then when Mr. Drury, the district attorney, came they went into Mr. Simmons's office, where the conversation was continued as follows: "Well, Mr. Parmentier submitted this report that he had to Mr. Drury, and the district attorney read it. I said: 'I don't care for a criminal prosecution of these fellows here,' and Mr. Drury said: 'Of course, you haven't anything to say about criminal prosecutions.' I said: 'No, I want it distinctly understood that I am not interfering with the district attorney's duties in any way.' Mr. Parmentier discussed this report at considerable length. He said: 'We are willing to admit everything you say is true.' . . . He said: 'I have never seen such a case as this in the history of the *Western Union Telegraph Company,* so flagrant a violation of the regulations of the company, and I don't think you will ever hear of such another one.'

"*Q.* Did he say anything about the contents of the report? *A.* He discussed it with Mr. Drury and with Mr. Simmons and myself and with Mr. Mohr. Mr. Mohr was present, and I think then we turned considerably into general conversation, and there was considerable kidding of Mr. Mohr. Some of them suggested that the sheriff take Mr. Mohr back to Milwaukee. We were rather convinced that Mr. Mohr had not official knowledge, that he had not personally been connected with the sending of the telegram asking for the stuff. We wanted to be fair with Mr. Mohr. We told him if he did not personally have that in charge we didn't want to arrest him under any criminal charge, but we couldn't see why Mr. Mohr objected to coming to Kenosha.

"*Q.* Was anything else said there that day, that you recollect? *A.* Mr. Parmentier talked to both Mr. Drury and Mr. Simmons, and he said that the company would see that the men who had been connected with the handling of this matter were discharged, cleaned out entirely.

"*Q.* Did you have any conversations with any representatives of the defendant after this, relative to the transaction? *A.* No."

This is substantially all the testimony in the case on the subject of ratification. It has been set out quite fully because plaintiff claims that, in connection with the fact that Miller is still in defendant's employ, it shows ratification as a matter of law. We shall assume that Miller was not discharged on account of his misconduct, though that fact does not appear by competent evidence. But retention of an employee guilty of a tort is only one fact among others tending to show ratification. It is not conclusive. It may be consistent with the strongest disaffirmance and condemnation of the act, as in this case. Mr. Parmentier said: "I have never seen such a case as this in the history of the *Western Union Telegraph Company,* so flagrant a violation of the regulations of the company, and I don't think you will ever hear of such another one." He told plaintiff, "Now we are willing to do whatever you want us to do. We will discharge Miller and every man connected with the office, and make a clean-out of it." To which plaintiff replied, "Why, no, Parmentier, I don't care to have you discharge Miller and the rest of the.fellows and put in another bunch, and I would have to educate them." It is true that when he said that he believed Mohr was the one to blame, but later, when he knew and admitted that Mohr was innocent, he never indicated by a syllable any change in his attitude towards Miller's discharge. He asked that Miller be not discharged, and because his wish was granted he now says the company ratified Miller's acts in not discharging him. Plaintiff cannot blow hot and cold at the same time. The granting of his own request cannot be made the basis of punitory damages. The fact that Parmentier in his talk with the district attorney assured him that the men connected with the handling of this matter would be discharged cannot alter the situation, for, as the district attorney informed plaintiff and as he himself said, he had nothing to do with a criminal prosecution or the district attorney's handling of his branch of the matter. It

seems clear, therefore, that where the evidence shows that the company denounced the tortious acts of its employee in the strongest terms and offered to discharge him and every one connected therewith, but were requested by, plaintiff not to do so, and did not, there is no basis whatever for ratification, and nothing to submit to the jury on that issue. Since the case is not one for punitory damages and the compensatory damages are nominal only, the judgment must be reversed.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for plaintiff for one dollar, compensatory damages.

KERWIN and ESCHWEILER, JJ., dissent.