ETHEL N. CLAVER AND METTA B. CLAVER, an infant, by her next friend, Defendant in Error, v. WOODMEN OF THE WORLD, Plaintiff in Error.

Kansas City Court of Appeals, January 2, 1911.

1. FRATERNAL ASSOCIATION: Warranty. There is no breach of the warranties in a death benefit certificate and the application therefor, where the question propounded clearly was intended to relate to none but hereditary diseases, and the evidence disclosed that the mother of insured had become insane from disease and senile decay, and not from any taint in the family blood.

2. ———: ———: **Suicide.** Where suicide is set up as a defense to a recovery on a death benefit certificate, the burden is on defendant to overcome the natural presumption against suicide by a great preponderance of the evidence, and when the presence of carbolic acid in the stomach of the insured after death, is accounted for by the fact that he had been taking creosote, prescribed by his physician to alleviate pain, creosote being similar to carbolic acid in odor and effect, the trial court properly overruled the demurrer to the evidence.

Error to Buchanan Circuit Court.—*Hon. C. A. Mosman*, Judge.

AFFIRMED.

*B. J. Castcel* for plaintiff in error.

(1) It stands admitted that defendant is a fraternal beneficiary association, organized in Nebraska, and doing business. at the time it issued the certificate sued on, in Missouri, as an assessment insurance company, within the meaning of article 3, chapter 119, Revised Statutes of Missouri, 1899, and not governed by the general insurance law of the state. Hanford v. Mass. Ben. Assn., 122 Mo. 50; Aloe v. Life Assn., 147 Mo. 561; McDermott v. Modern Woodmen of Am., 97 Mo. App. 636. (2) Instruction No. 1, given for plaintiff, is wrong for two reasons: 1st, It wholly disregards the defense of insanity. 2d, While it cautions the jury not to speculate as to whether he did die by his own hand, but strongly intimates that they might speculate as to whether he did not die by his own hand. In other words, it casts too great a burden on the defendant to prove suicide. (3) The court erred in refusing to give the jury instructions numbered 4 and 5, asked by defendant. The giving of instruction No. 1 for the plaintiffs and refusing to give instructions 4 and 5 asked by defendant, took away from the jury the defense of insanity. That Claver's mother was insane when he made application for the beneficiary certifi-

cate sued on, there can be no doubt, nor is there even a denial. But plaintiffs contend that it not appearing that the insanity was hereditary, there was no breach of the warranty. Not conceding the claim of plaintiffs, except for the argument, what is the logical situation, when she is proved insane? Is the burden on defendant to show that the insanity is hereditary, or on plaintiffs to show that it was not? At any rate, should not the jury have passed upon it? Whatever kind of insanity is referred to in the application, hereditary or not, defendant claims that its answer denies the truthfulness of John B. Claver's answer, when he said that none of his parents, etc., suffered from insanity. That answer being a warranty of its truthfulness, the burden vested with plaintiffs to show that it was true. It is like a condition precedent in a contract, the burden is on plaintiffs. Sec. 634, R. S. 1899; Walker v. Phoenix So., 62 Mo. App. 224; Maddox v. Ins. Co., 56 Mo. App. 343; Halloway v. Ins. Co., 48 Mo. App. 5; Life Ins. Co. v. Johnston, 80 Ala. 467; Edgerly v. Farmers' Ins., 43 Iowa 587, and cases above cited. (4) The case of Northwestern Mut. Life Ins. Co. v. Gridley, 100 U. S. 614, 617, is not in point, and to see the distinction, one only has to read the case of The First Nat. Bk. of Kansas City v. The Hartford Fire Ins. Co., 95 U. S., 673, 679. (5) · A new trial should have been granted on the newly discovered evidence, as it discloses such a condition of taint in the blood of Claver's ancestors, that had those facts been known, no certificate would have been issued to him. The testimony was not cumulative; it was not known to defendant at the time of trial; defendant was not guilty of negligence in not having the testimony at the trial; it would have controlled the verdict, and in fact all the conditions necessary to grant a new trial on newly discovered evidence exists. Langdon v. Kelly, 51 Mo. App. 572.

*Brewster, Ferrell & Mayer* for defendant in error.

(1)  Plaintiff's instruction No. 1 correctly submitted the question of suicide.  The instruction simply placed the burden upon defendant, where it belonged. The instruction was not as favorable to plaintiffs as plaintiffs were entitled to.  Almond v. Modern Woodmen of America, 133 Mo. App. 382.  (2)  There was no error in the court's refusal to submit the question of insanity.  The burden of proving the untruthfulness of the assured's answer was upon defendant.  The negative answer of the assured was not untrue, unless the mother's insanity was hereditary.  The assured was not asked if his mother was insane, but he was asked if she had suffered from hereditary insanity. There was not a scintilla of evidence that the mother's insanity was hereditary, and therefore no evidence of the untruthfulness of the assured's answer.  Gridley v. Life Ins. Co., 11 Fed. Cas., p. 2.  The case was affirmed by the U. S. Supreme Court, 100 U. S. 614, 25 L. Ed. 746.  Sinclair v. Life Ins. Co., 22 Fed. Cas., p. 195.  The case of National Bank of Kansas City v. The Hartford Insurance Company, 95 U. S. 673, cited by appellant as destroying the effect of the above cases, has no bearing upon them or upon the case at bar, except that the last paragraph of the opinion in the case cited by appellant seems to strengthen respondent's contention.  The paragraph is as follows:  "It is its (the company's) language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself."  (3)  The appellant's contention that the burden of proving the truthfulness of the assured's answer was upon plaintiffs' is unsound, and contrary to the theory upon which the appellant tried the case below.  The court committed no error in refusing to grant a new trial on the affidavit of newly discovered evidence.  Cook v. Railroad, 56 Mo. 380; Coleman v.

Cole, 96 Mo. App. 22. The newly discovered evidence, according to the affidavit, was to come from the lips of a witness who had testified for defendant. He was unfriendly to the plaintiffs. He was examined as a witness at great length by defendant's counsel. The alleged newly discovered evidence does not touch any issue raised by the pleadings. There were but two issues under the pleadings, namely; did assured commit suicide and had his mother suffered from hereditary insanity. The affidavit of newly discovered evidence shows conclusively that nothing appellant claims to have discovered throws any light on either of these issues.

JOHNSON, J.—This suit is on a death benefit certificate issued to John B. Claver, November 30, 1907, by defendant, a foreign fraternal beneficiary society duly authorized to transact business in this state. The assured died in St. Joseph, July 5, 1908, and defendant denied liability on two grounds, viz.: First, a breach of warranty in the answer of the assured to a question in the application and, second, the suicide of the assured in violation of the terms of the certificate. A trial to a jury resulted in a verdict and judgment for plaintiffs and the cause is before us on writ of error sued out by defendant.

The certificate stated that it was ''issued in consideration of the representations, agreements and warranties made by the person named herein in his application to become a member'' and the application signed by Claver contained the following warranties and agreements: ''I hereby certify and agree and warrant that all the statements, representations and answers in this application . . . are full, complete and true. . . . I agree that in the event of my death by my own hand or act, whether I am at the time sane or insane, then my beneficiary certificate in said order shall be null and void and of no effect and all my rights

and benefits which may have accrued on account thereof shall be absolutely forfeited.'' Among the questions and answers in the application are these: ''Have any of your parents or grandparents, uncles or aunts been subject to consumption, cancer, gout, scrofula, insanity or any other hereditary disease, or committed suicide?'' Answered, ''No.''

The fact is undisputed that in May, 1907, six months before the application for the certificate in question, the mother of the applicant was pronounced insane and sent to the state hospital at St. Joseph, where she died August 2, 1908. She was seventy-one years old and had been in good health until some ten weeks before her admission to the hospital. In that period she had suffered from typhoid fever, from a stroke of appoplexy and from a most severe stroke of paralysis. Evidently her dementia was caused by the ravages of these diseases on a body and mind afflicted by senile decay. There is no suggestion in the evidence that it was due in any degree to hereditary taint.

Facts in evidence pertinent to the issue of suicide thus may be stated: Claver drove a mail wagon for a morning newspaper published in St. Joseph and on the night of his death reported for duty at eleven o'clock p. m., the usual hour. He had been complaining of sickness at the stomach for two or three weeks and had been taking medicine. He looked like a sick man to the clerk in charge of the mailing room and at four o'clock he said he felt too ill to go out on the mail wagon and the mailing clerk went out in his place. The clerk testified:

''I left there to make the trip about twenty minutes past four o'clock. Returned shortly after six a. m. When I got back he was in the office which is in the basement. He was lying on a bench. He said, ''I am sorry that you had to make that South St. Joseph trip for me. I don't want to go down there, it is all over now.' I finished up my reports. We

started for home. I met him out in front of the office again. I went on; as we walked down the street he says: 'Mitchell, I was not drunk this morning.' I says, 'I know it—what is the matter with you anyway?' 'My stomach is bothering me.' 'Why do you not get a doctor?' 'I don't know that it would do anybody any good.' . . . I left Claver on Edmond street."

On cross-examination the witness said: "There was nothing unusual about Claver being in the basement. It was where the men worked that were employed by the *Gazette*. It was lighted. I walked down with him to Berger's about a block from the *Gazette* office, about 6:30 or 7:00 a. m. . . . He acted like a sick man. He kind of moped around instead of being lively. He acted as if he were suffering pain. Like I would act if I were suffering intensely from some sickness. There was nothing in his demeanor that he was going to commit suicide."

After separating from the mailing clerk, Claver evidently returned to the mailing room for, at seven o'clock, his groans attracted other employees to the place and he was found lying on the floor in a dying condition. The coroner testified: "I held a post mortem examination on him and found the stomach containing carbolic acid I thought in sufficient quantity to produce death. There was no burning on his lips, on the outside of his mouth. His lips were not burned —but very little, but down his tongue—further on his tongue he had been burned some and as far as I could see down his throat, but outside on his lips— I mean just inside, was not burned very much, if any. I could not tell whether it had been taken intentionally or accidentally. When I opened the stomach there was odor of carbolic acid. The food pipes was burned some—the oesophagus. There is no way to tell how long the carbolic acid was in his stomach before he died. If a maxi-

mum dose should be taken it might produce death in
ten or fifteen minutes; if less it is possible to be suffi-
cient to produce death and the party live twelve hours.
I have known of them living twelve hours after tak-
ing it. I could not state how much was taken by the
effect of it, as it mixes with the juices and food of the
stomach. I could not tell whether the dose was a max-
imum or a minimum dose except in the probable du-
ration of life afterwards, that is the only way I could
tell. In my opinion, carbolic acid poisoning was the
cause of John B. Claver's death.''

On cross-examination he said: ''Creosote is sim-
ilar to carbolic acid. If they were in two bottles, I
might not tell the difference. A man might take car-
bolic acid, thinking he was taking creosote. Creosote
is a poison also. The dose is small. Physicians pre-
scribe it as a medicine for colds and lung troubles. The
dose is from three to ten drops. Ten drops would
not produce death. It is generally taken in capsules,
or in a mixture. It is not pleasant to take.''

A physician who was present at the autopsy testi-
fied: ''I noticed the condition of Mr. Claver's mouth,
and the mucous membrane. It had the typical signs
of carbolic acid irritation; the whitening or blanch-
ing of the membranes; also of the entire lining of the
stomach; a decided odor of carbolic acid; the typical
sign of poisoning. I think there was a slight burn about
the lips; not extensive, however, on the outside of the
mouth.'' On cross-examination he said: ''I do not
know whether he took the carbolic acid on purpose or
by accident. It might have been accidental. Such
things happen. Creosote smells very similar to car-
bolic acid. It takes an experienced hand to tell the
difference.''

The physician of Claver introduced as a witness
by plaintiff testified: ''I knew John B. Claver, the
husband of Mrs. Claver, here, the plaintiff in this case.
He was one time a patient of mine; probably for a

couple of years at different times. Just prior to his
death, I don't know exactly how long before, I was
treating him for a cold, and dyspepsia; he had some
stomach trouble; I prescribed for him some cough
syrup or some medicine for the cough which he had
and probably something for indigestion. I frequently
prescribe creosote. I am satisfied that I did for him,
because I so frequently do that. It smells like car-
bolic acid. The odor is very similar to carbolic acid,
and the effect upon the mucous membrane is the
same."

To show a motive prompting him to commit sui-
cide, defendant introduced evidence tending to show
that Claver's married life had been most unhappy and
that he had discovered that day that his wife from
whom he was separated a second time was receiving
attentions from another man. In justice to Mrs. Cla-
ver we say that the fact on which defendant attacks
the propriety of her conduct, in our opinion, does not
afford any ground for accusing her of impropriety,
though it might support a reasonable belief that Cla-
ver had been greatly perturbed at seeing her accom-
panied by another man.

At the request of plaintiffs the court instructed
the jury: "That your verdict should be for plaintiffs
unless you believe from the evidence that John B.
Claver did die by his own hands; that is, he died as the
result of having taken a drug with the intent to end
his own life; and you are instructed that the burden
of proving that the said John B. Claver did die by
his own hands is upon the defendant, and in deter-
mining this fact you should not speculate or guess as
to whether or not he did die by his own hands, but
unless the defendant has proved to your satisfaction
by a preponderance of the evidence in this case that
the said John B. Claver did die by his own hands
your verdict should be for the plaintiffs."

The first question raised by the demurrer to the evidence is whether or not the certificate should be declared void on the ground that Claver intentionally gave a false answer to one of the family history questions. Since defendant is a fraternal society authorized to do business in this state the general insurance laws have no application to the contract before us. The answer of Claver to the questions propounded to him were made warranties by the express terms of the application and certificate and the rule is well settled that "where a warranty is part of a contract it must be strictly complied with. 'It is in the nature of a condition precedent, and no inquiry is allowed into the materiality or immateriality of the fact warranted.' " [Aloe v. Insurance Co., 147 Mo. l. c. 575.]  "In the absence of such statutory regulations as prevail in cases of ordinary insurance, false declarations, if made contrary to the agreement of the parties, will vitiate and avoid a policy of life insurance, although such declarations be not material to the risk." [Whitmore v. Sup. Lodge, 100 Mo. 36; Hanford v. Ben. Assn., 122 Mo. 50; McDermott v. Modern Woodmen, 97 Mo. App. 636.]

It is well said in the case last cited: "Warranties must be strictly true according to the intention of the parties; but what was intended and understood to be warranted is ascertained by the same rules of interpretation applied to other contracts, and all reasonable doubts about the compass of a warranty will be resolved in favor of the insured." Tested by this rule we do not find any evidence of a false statement uttered either intentionally or innocently.

The question propounded clearly was intended to relate to none but hereditary diseases. If it was not intended to qualify each of the diseases named with the adjective "hereditary" what function in the sentence was performed by the adverb "other?" The import of the question is the same as it would be were

the word "hereditary" placed before each of the mentioned diseases. Defendant says this cannot be so because some of the diseases named, e. g., gout are not hereditary. Gout may not be hereditary in the sense that the seeds of the disease are transmitted from parent to child but there is abundant scientific authority for the theory that it is hereditary in the sense that a predisposition to contract it does run in certain families. The same may be said of consumption, cancer or insanity. There is much plausibility in the theory that none of these diseases is inheritable but only the tendency to contract them. It is but fair to Claver to infer that he understood the question to relate only to diseases that were a taint in the family blood—to insanity that recurred habitually or occasionally in the line but not to a mere sporadic instance where it appeared from some special cause peculiar to the individual. It is reasonable to suppose that the insurer might not care to be informed of a case where insanity was of traumatic origin, was caused by disease, or was merely a form of senile dementia brought on by old age and feebleness. We do not think the meaning of the question is ambiguous but if it were we would adopt the meaning most favorable to the insured. A truthful answer was given. Indisputably the insanity of the applicant's mother was caused by disease and senility and was not due to any hereditary taint.

Passing to the question of suicide, we hold that question is presented by the evidence as an issue of fact which was properly submitted in the instruction quoted.

There is room for the belief that the unhappy man did take his own life, but the facts and circumstances in evidence will support the opposite conclusion. We start out with the presumption, and it is a very strong one, that no one will commit the crime of self-murder no matter how great the provocation may be. The burden was on defendant to overcome that presump-

tion and this has not been done in a way that would justify us in declaring, as a matter of law, that the deceased intentionally took his own life.

"The presumption of law is against suicide. It is said that when a man is charged with crime, the law presumes that he is innocent, unless proven guilty beyond a reasonable doubt. Can the presumption in such instances be greater than it should be that a man has been guilty of self-murder? We think not. The natural instinct is to recoil from death. Self-preservation is the first and most compelling instinct of man. And to overcome the natural presumption against suicide there should be a great preponderance." [Almond v. Modern Woodmen, 133 Mo. App. l. c. 388.]

The presence in the stomach of what the coroner assumed was carbolic acid is accounted for by the testimony of Claver's physician who gave him creosote in a prescription. All of the doctors agree that creosote is similar to carbolic acid in odor and effect and it is reasonable to infer that Claver, to alleviate the great pain he was suffering from his illness, took too large a dose of medicine and died from the effects of creosote. The court properly overruled the demurrer to the evidence and, since we find no error in the instructions, we perceive no reason for disturbing the verdict.

There is no merit in the contention that a new trial should have been granted on the ground of newly discovered evidence.

The judgment is affirmed. All concur.