MARY RICHEY, Respondent, v. THE WOODMEN
OF THE WORLD, Appellant.

Kansas City Court of Appeals, April 1, 1912.

1. FRATERNAL BENEFICIARY ASSOCIATIONS: Suicide.
Plaintiff sought to recover upon a benefit certificate containing
a stipulation against suicide, issued to her husband. The only
issue submitted was whether or not death was self inflicted
with suicidal intent. *Held*, that the evidence did not warrant
the submission of the case to the jury.

2. ———: ———: Submission to Jury. Suicide is an affirma-
tive defense and ordinarily must be submitted to a jury, but
where all the evidence is of such a character that it affords
no room for reasonable controversy, there is no issue for the
triers of fact to determine.

Appeal from Nodaway Circuit Court.—*Hon. William
C. Ellison*, Judge.

REVERSED.

*A. H. Burnett* and *Shinabarger, Blagg & Ellison*
for appellant.

(1) The court erred in refusing to give appel-
lant's peremptory instruction at the close of all the
evidence. Egan v. Ins. Co., 80 N. W. 1020, 105 Wis.
217; Thiebaud v. Woodmen of the World, 69 Pac.
348, 65 Kan. 332; W. O. W. v. Hruby, 96 N. W. (Neb.)
998; W. O. W. v. Huyler, 24 Ind. App. 109; Mason
v. Supreme Lodge, 109 Ill. App. 10; Fletcher v. Sov-
ereign Camp, 81 Miss. 249. Same facts passed on in
78 Miss. 377 and 111 Fed. 773. (2) The verdict and
judgment were against the evidence, the proof of sui-
cide being so clear as to leave no issue to submit to
the jury, in view of the note, which was properly ad-
mitted in evidence. Rogers v. Life Asso., 71 Pac.
(Cal.) 348, 138 Cal. 285; Sharland v. Washington Life,
101 Fed. 206; Rens v. Relief Asso., 71 N. W. (Wis.)
991; Mutual Life v. Hayward, 37 S. W. (Texas) 36.

*C. C. Crow, John E. Owen* and *B. Raleigh Martin* for respondent.

Appellant does not cite a single Missouri authority to sustain its position on the facts in this case. By a long line of decisions in this state the question here submitted has been finally settled, whatever rule the court of other states may have adopted. It is not necessary to cite numerous decisions to sustain the ruling of the trial court in this case, for the reason that this court in two recent decisions has reviewed all the law on the subject and set at rest all question about the rule in this state. Almond v. Modern Woodmen, 133 Mo. App. 382; Claver v. Woodmen of the World, 152 Mo. App. 155.

JOHNSON, J.—This suit is on a death benefit certificate issued by a fraternal beneficiary association incorporated in Nebraska and licensed to do business in this state. The certificate contains a stipulation against suicide and the sole issue submitted to the jury was whether or not the death of the holder was self-inflicted with suicidal intent. The jury decided that issue in favor of plaintiff and defendant, appealing from the judgment rendered on that verdict, asks us to hold as a matter of law that the defense of suicide indisputably was proved.

Plaintiff, the beneficiary named in the certificate, is the widow of Philip S. Richey who died at his home in Nodaway county on the morning of January 25, 1909. In the two months preceding his death Richey, who was forty-two years old and in good health, increased his life insurance from $1000 to $7000. A policy of $2000 was issued to him by an old line company and the remainder of the increase consisted of certificates issued by fraternal beneficiary associations, among them the certificate in question.

Richey was a farmer living on a rented place and his family was composed of himself, his wife and their seven children. He was ·unsuccessful as a farmer, was overburdened with debt, and was planning to move to a farm of forty acres which he owned but which was encumbered by a mortgage of $400. He had contracted with his father-in-law for the purchase of an· adjoining tract of forty acres at thirty-six dollars per acre and intended to add that tract to his farm. He was an amiable, even-tempered man, though somewhat taciturn, and was a kind and affectionate husband and father. He did not betray discouragement over his failures and· pecuniary embarrassment, was proceeding in a rational and rather hopeful manner with his plans for the future, and neither by word nor act had disclosed any intention or even thought of self-slaughter. A few moments before his death he started from his ·house to the barn to water the stock. There was nothing unusual in his demeanor and on leaving the house he addressed a jocular remark to his wife. He passed by his eldest son and two neighbor boys who were sharpening an ax at a grindstone and asked his son if a certain horse in the barn had been watered. Receiving a negative reply he said he would water the horse and went on to the barn which was a hundred yards or more beyond the grindstone. Immediately after he disappeared into the barn the boys heard him cry in distress and, supposing he had been kicked by the horse, one of the boys ran to his assistance and found him in the passageway of the barn in the throes of death. In a moment he expired and the boy ran to the house and told plaintiff of the tragedy and then hurried home to spread the news. Plaintiff and her children rushed to the barn and in a few minutes the neighbors began to arrive. The cause of the death of the unfortunate man was apparent and is conceded. He drank carbolic acid from a two ounce

vial and the only point in dispute is whether he took
the poison by mistake or with the intent to end his
life. The vial was found . outside the barn where,
doubtless, the deceased had thrown it, and a few drops
of the poison still remained in it. The mouth and
chin of the deceased were badly burned and all of
the testimony including that of physicians who ex-
amined the body, is to the effect that the burns. were
caused by. carbolic acid. Plaintiff testified that her
husband had been suffering from a mild attack of
grippe and for several days had been taking medicine;
that she had prepared a cough remedy from mullein
leaves for him which she had put into a small bottle;
that he had procured another bottle of medicine from
a physician, that these bottles were kept on a shelf
with other medicines and drugs and that among them
were two small bottles of carbolic acid. The bottle
found outside the barn had a fresh label and a new
cork, showing that it had been recently purchased and
plaintiff does not say that it was one of the bottles
kept on the shelf nor does she say that she found one
of the bottles of poison missing from the shelf aftei
the death of her husband. Defendant contends that
when plaintiff and her family arrived at the scene of
death they found a note in the handwriting of deceased
pinned to the lapel of his coat and that plaintiff re-
moved the note and exhibited it to neighbors who
assembled. Defendant served notice on plaintiff to
produce the note but she failed to produce it and
stated that she had no such note in her possession.
Thereupon defendant introduced evidence showing
that such note was found and when last known to be
existent was in the possession of plaintiff. The court
then permitted defendant to introduce secondary evi-
dence of the contents of the note. We think it im-
portant to speak of that evidence in detail. The note
was as follows:

"Dear Wife: I am sorry to leave you, but I feei impelled to do so. You are the best woman in the world. Raise all the children in the right way. I think it best that I leave this world."

Only one of the boys at the grindstone went to the assistance of Richey in response to his cry and, as stated, he was in the barn only a moment. After giving the alarm he went home and did not return until after neighbors had collected and the body had been removed to the house. He testified: "I went home after ten o'clock that day. I didn't see or hear a note read that day that I recollect of. I was not present at any time anything of that kind occurred. When I came back down to the Richey's after I had gone home I was just around there with the boys, Elmer Richey and Luther Belcher. My brother Jesse didn't come back. I was around the woodpile and didn't go in the house a great deal. The older people —neighbors— were in the house. When I came from the barn after having found Mr. Richey, I told Mrs. Richey. She and the children started toward the barn, running, I believe. Elmer and the rest of the children were with her. Elmer is older than I am, I think. None of the boys or girls in the family were older than he was. All of them started out toward the barn. I don't know who was the next person who got to the Richey place after I was there. I saw Dr. Martin or Mr. Croy or Mr. Taylor, or some other people on the road after I got home."

Mrs. Croy, a neighbor, introduced by defendant, testified that she and her husband arrived at the Richey home before the body had been removed from the barn to the house. We quote from her testimony:

"You may tell the court and jury whether or not Mrs. Richey told you after you went down there, anything about having found a note pinned on the body —on the coat of Mr. Richey? . . . She told me about a note and showed it to me at that time. I had

hold of it and tried to read it, but I had forgotten my glasses and couldn't read it very well. Mrs. Mort Smith read it aloud in my presence. I talked to Mrs. Richey about the cause of her husband's death. . . . Q. What did she say to you in that connection? A. I don't just remember now. Q. Just as nearly as you can? A. Which do you mean? Q. About how Mr. Richey came to his death. A. Well, I don't know that she really said anything about how he came to his death. She seemed to know that I knew it. Q. What did she say? A. Well, I can't remember now what she said. . . . Q. Can you give the substance of what she said? A. Which? The substance of the note? Q. Yes. Of what Mrs. Richey said in connection with the note A. I don't fairly understand you. What do you mean? Q. Can you tell anything she said in connection with reading the note? A. What she said of the note—what was in it? . . . Q. What, if anything, did she say to you in that connection? A. She told me to put it away and take care of it. Q. What, if anything, about publishing it?"

By the Court: "Hold on a minute. Told you to put it away and take care of it? A. Yes, sir. She told me to take it and care for it."

By the Court: "Well, did you? A. Yes, sir."

By the Court: "Have you got it? A. No, sir."

By the Court: "Where is it? A. I know nothing about it. She told me, at the time, to put it up and care for it, and I did, and put it up in the clock; and afterwards it was taken out and given to her, and I know nothing about it. . . ."

"Q. Well, would you remember the substance of the note, if you would hear it? A. Yes, sir.

"Q. I will ask you then, if it read something like this—"

By the Court: "Oh, no, I can't allow that to go in."

By Mr. Ellison, counsel for defendant: "We want to show that this note is the same note that that notice refers to."

By the Court: "No. You can let her read that and see. . . ."

"Q. Now, Mrs. Croy, would you say that what is contained therein is, in substance, what was read to you or that you read? A. Yes, sir. . . .

"Did she tell you where she got it? A. I gave it to her myself.

"Q. I know. But did she tell you where it came from—where they found it? A. No, sir; I don't think she knew.

"Q. Don't think she knew? Did she tell you, in that conversation, who the note was from? A. Yes, sir; I think so.

"Q. Who? A. Her husband.

"Q. After telling you that, she told you to keep it and put it away for her? A. Yes, sir.

"Q. Did she tell you when or where it had been found? A. No, sir.

"Q. Was there any perforations in it? A. Yes, sir.

"Q. How many? A. Two, that I remember.

"Q. About how large? A. Well, the size of a pin.

"Q. And in handling it, do you know whether or not there was any substance on it? If so, what? A. Carbolic acid.

"Q. How do you know that, Mrs. Croy? A. Because I got some of it on my hand and some on my face. . . .

"Q. Now, Mrs. Croy, in your own language, you state as nearly the contents of that note as you can—what it said. A. Well, I don't know as I can repeat it exactly.

"Q.  Do the best you can.  A.  He wished her to raise the children right, and he thought what he was doing was for the best, or something of that kind; that she had always been a good wife to him—was the sum and substance of it.  It was short.

"Q.  To whom was it addressed?  A.  To his wife.

"Q.  He said what—I didn't get it—what was the best?  A.  Which?

"Q.  You said something about what he was doing he thought was for the best?  A.  I don't know.  He said he thought what he was doing was for the best. I suppose dying was for the best, he thought."

By the Court:  "Don't make any deductions. State what was in it."

"Q.  What, if anything, was said about the children?  A.  He said to raise his children right."

Cross-examination.

"A.  I was not personally acquainted with the handwriting of Mr. Richey.

"Q.  And of your own personal knowledge, you don't know that he wrote that note at all?  A.  Of course I could not prove that he did.

"Q.  Of your own personal knowledge?  A.  No, sir.  There was no date on the note and no name was signed to it at all."

Dr. Todd, the coroner, testified that he went to the Richey farm in the afternoon and examined the body and that he found the cause of the death to be so apparent that he concluded not to hold a jury inquest. About the note he testified:

"Q.  Did you see any note there, at the time?  A. Yes, sir.

"Q.  Who showed it to you?  A.  My memory is that Mrs. Richey handed me the note when I went back into the room.

"Q.  Did you read it?  A.  Yes, sir.  The best I could."

By the Court: "How did you come to see that note? A. It was handed to me, as I remember, by Mrs. Richey."

By the Court: "Well, what, if anything, did she say as to where it came from?"

"A. That it was found on the body or in a pocket on the body. And I took it as an evidence of—"

By the Court: "Never mind what you took it for. Be careful not to state your deductions, Doctor."

"Q. What was it that you say that she stated to you that it was found where? A. On the body or in his pocket. I wouldn't say which.

"Q. In your opinion, whose handwriting was it in? A. That was Mr. Richey's—"

By the Court: "Hold on. Made up from the appearance of the writing? A. Yes, sir."

"Q. What do you say as to that? A. I say that it was his writing.

"Q. Will you please state to the court and jury what the substance of the note—do you remember its contents in detail? A. I think not. I remember— Q. Can you give in substance the contents of it? A. I think so. Q. Now, do that, in your own language. A. The letter was addressed to—as I remember—to 'My Dear Wife: You have been a good wife,' is my memory of it. 'Take good care of the children. I think this is best.' Or something like that. Not signed."

Marion Ulmer, called as a witness by plaintiff, testified on cross-examination:

"Q. Now, can't you tell the jury what, if anything, she (plaintiff) said about the cause of her husband's death there, please? A. Well, about all she said to me, she said there was a note that he had left. She showed me a note that—

"Q. Uh huh. Did you read it, Marion? A. No, I tried to read it. I just read a word or two of it.

"Q. Was it addressed to her? A. I think so, yes, sir.

"Q. Did it say, in that note, that 'I am sorry to leave you. Take good care of the children. You have been a good wife. I think it is best to leave this world —to do this and to leave the world,' in substance? A. That is the substance of it, Mr. Blagg. I couldn't tell—"

Mrs. Dora Smith, another witness introduced by plaintiff, testified on cross-examination:

"Q. Were you there at the—when your boy Walter came up you went down immediately, Mrs. Smith? A. Yes, sir.

"Q. During any time that you were there, did you see or read or hear read a note that had been found about there? A. Yes, sir.

"Q. Can you tell the court—I will ask you if you remember, in substance, what that contained? A. No, I can't exactly.

"Q. Was it addressed to his wife? A. I think it probably was.

"Q. Did it say, 'Dear Wife'? A. I can't say just how it went.

"Q. I know. But, now, listen: It was addressed to her? A. I think so.

"Q. And did it say that she had been a good woman? A. I think so.

"Q. How is that? A. I think so.

"Q. 'Take good care of the children'? A. Yes, sir.

"Q. 'And I think it is best to leave this world and to do this'? A. Well, I can't say to all of that.

"Q. That is substantially what it contained? A. I can't say what it was.

"Q. 'I am sorry to leave you. You have been a good wife. I think it is for the best. Take good care of the children.' That is substantially what it contained, was it not? A. Yes, sir.

"Q. You think that is substantially what it contained? A. I can't say how it read, exactly.

"Q. You heard it read more than once? A. No, sir; I don't think I did.

"Q. You had it in your hands and know about its contents? A. Yes, sir."

Mort Smith and Dr. Martin also testified that the note was exhibited to them and others with the statement that it had been found on the body of the deceased.

Some of the witnesses who were at the farm shortly after the death of Richey said they did not see the note or hear about it, but no attempt was made by plaintiff to deny that a note of the kind described by the witnesses from whose testimony we have quoted was found on the body of her husband, was in his handwriting, and was shown by her to the coroner and to a number of her friends. While on the stand plaintiff did not deny the admissions concerning the note the witnesses say she made and the only testimony elicited from her on the subject is the following:

"Q. You may state, Mrs. Richey, whether or not you handed Dr. Todd the note referred to by him in suit? A. No, sir. Not that I recollect of. I don't recollect of handing the note to anybody."

Instead of being a denial of the fact that her husband wrote and left on his person a farewell note, the answer of plaintiff, in effect, admits the existence of such fact and since a number of witnesses, of whose credibility and sincerity there can be no question, testified to the existence of the note and to the admissions of plaintiff that it was in the handwriting of the deceased and was found on his person and since such testimony was given by witnesses introduced by plaintiff as well as by her adversary and is uncontradicted by any evidence and, in effect, admitted by plaintiff, we must regard the facts appearing in their testimony relating to the note as proved. If proof of

the existence of these facts appeared only in evidence adduced by defendant, we would not interfere with the ruling of the trial court in treating such evidence, though uncontradicted, as possessing only enough probative force to raise an issue of fact for the jury. We held in Bank v. Hainlin, 67 Mo. App. 483, that "in a case where the evidence so far as appears by the record is uncontradicted and the trial court nevertheless refuses the peremptory instruction, the appellate court will assume that the trial court saw something in the manner of the witnesses to impair their testimony and will not interfere with the verdict."

But where, as here, the witnesses of the defendant are supported by the testimony of witnesses introduced by the plaintiff and whose credibility is vouched for by her, there can be no ground on which the rule just quoted may rest, and the uncontradicted facts common to the evidence of both parties should be regarded as proved and as offering no debatable issue of fact for the jury to solve.

Counsel for plaintiff, in their brief and argument, avoid reference to the note and rest their defense to the charge of suicide on the ground that the burden is on defendant to establish the fact of suicide and since defendant has the affirmative, necessarily the issue is one of fact that must go to the jury. It is true that in cases such as this, suicide is an affirmative defense and, generally, it is a defense that should be submitted to the jury as an issue of fact, but it is not true that an affirmative defense cannot be so clearly and indisputably established that its existence should not be accepted by the court as proved in law. Where all the evidence in a case is of such character that it affords no room for reasonable controversy about an ultimate fact, there can be no issue and, therefore, nothing concerning such fact for the triers of fact to determine. In each of the cases cited by plaintiff there was room in the evidence for a reasonable

inference against the fact of suicide and the issue properly was submitted to the jury. [See Almond v. Modern Woodmen, 133 Mo. App. 382; Claver v. Woodmen, 152 Mo. App. 155, and, also, Norman v. The Order of U. C. T. of America, decided at this term.]

But there is nothing in those cases, nor in any of the authorities we have consulted, that militates against the conclusion that the defense of suicide may be proved in law. The presumption against suicide is very strong—strong as the universal instinct for life—but it may be overcome by proof just as the instinct for life, in individual instances, may be overmastered by a desire for death, and we perceive no reason in law or logic for saying that the fact of suicide cannot be established in law. The true rule thus is tersely stated by the Supreme Court of Wisconsin in Agen v. Insurance Co., 80 N. W. 1020:

"Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case but the question should be decided by the trial court as one of law."

Applying this rule to the conceded facts of the present case we must hold the trial court erred in not peremptorily instructing the jury to return a verdict for defendant.

There can be no reasonable doubt that plaintiff's husband drank carbolic acid with the intention of destroying his life. The suggestion that his act might have been the result of mistake will not bear analysis and rests entirely on conjecture of the most unsubstantial and fanciful nature. The note pinned by the unfortunate man on his coat after he entered the barn disclosed his knowledge of the contents of the vial and his purpose to end his life. Plaintiff's testimony con-

vinces us that he did not obtain the vial from the medicine shelf in the house but we do not attach great importance to the question of where he procured the poison. The controlling fact is that he knew he was taking poison and could not possibly have been the victim of mistake or accident. In a minute after the boys saw him disappear in the barn they heard his cry and in that moment he pinned the note to his coat and drank the poison. We repeat that the theory of accident is conjectural, is opposed to the plain facts and circumstances of the case to all reasonable conclusions and we would do wrong to allow a judgment so entirely unsupported to stand. Accordingly the judgment is reversed.

All concur.