MARJORIE B. ROHRMOSER, APPELLANT, v. HOUSEHOLD FINANCE CORPORATION (A CORPORATION), RESPONDENT.—86 S. W. (2d) 103.

St. Louis Court of Appeals. Opinion filed September 20, 1935.

Appellant's Motion for Rehearing Denied October 16, 1935.

*Mason & Flynn* for appellant.

*Jones, Hocker, Gladney & Jones* for respondent.

HOSTETTER, P. J.—This suit was begun by plaintiff in the Circuit Court of the City of St. Louis, Missouri, on November 27, 1932, by the filing of her petition, naming the Household Finance Corporation and Earl Lowry as defendants. Later, the petition was amended by dismissing as to Lowry and reducing her prayer for damages to $1000 actual and $2000 punitive damages.

Her amended petition in substance averred the following:

That the defendant is a Missouri corporation engaged in the loan business in St. Louis city and elsewhere; that on March 16, 1932, she and her husband were indebted to defendant in the sum of $210, being a balance due on a $300 loan theretofore made to them, the payment of which was secured by a chattel mortgage on their household furniture, and on and prior to said date, one Earl Lowry, being in the employ of defendant corporation as its collector, repeatedly and at intervals while representing defendant, called at plaintiff's home in the daytime and in the absence of her husband for the alleged purpose of collecting the balance due on said loan; that on said date Lowry, in his capacity as collector, called at the apartment occupied by plaintiff and her husband at 5611 Enright Avenue in St. Louis City and knocked at her door; that plaintiff at that time was ill in bed; that she had a chain protector on the door and in response to Lowry's knock she arose and partially opened the door; that Lowry requested admittance stating that he had come to see plaintiff about said indebtedness; that she excused herself, closed the door, dressed, put the room in order and admitted Lowry; that he then asked her when she was going to pay the loan and she replied that she didn't know just when it could be paid, that she and her

husband were not able to pay it at that time; that thereupon Lowry said to plaintiff, in substance, ''Who is paying your bills for you; I know plenty of men who would be glad to pay your bills for you;'' that thereupon she arose to her feet and demanded what Lowry meant and that, thereupon, he seized her by the hand with one of his hands and with the other caught the collar of her dress and tore it entirely down the front and inflicted bruises upon her right hand and upon her chest; that said assault was made by him in the course of his employment as collector for defendant corporation and that as a result of same she suffered great pain, humiliation and derangement of her nervous system, etc., for more than a month following.

The answer was a general denial.

The facts as developed by testimony adduced by plaintiff and on her behalf, were as follows:

The loan in controversy was originally for $300 and was contracted in April, 1931, the note being signed by both husband and wife and a chattel mortgage on their furniture to secure the payment of same was given and the loan was to be paid off in monthly installments. The mortgaged furniture was in storage. They had been making payments each month, but tardily, until the indebtedness was reduced to $210; that Lowry had been coming to make the monthly collections since January, 1932; that when Lowry made his first call she advised him that her husband had been in the hospital under an operation and they couldn't pay the loan and to go ahead and sell the furniture and if it didn't bring enough they would pay the balance and that Lowry replied that the company didn't want the furniture, that it wanted the money; that he used to come once or twice a week; that on March 16, 1932, he called between 12:30 and 12:45; that she had a chain on the door to the room and when Lowry knocked she peeped out and saw who it was and said ''Pardon me for just a moment'' and Lowry said, ''All right,'' then she shut the door and straightened up her bed, put the chair in place and opening the door said: ''Mr. Lowry, I am awful sorry to keep you waiting in the hall; I am sick today and don't feel like talking business, and I had to fix my bed up before I could talk to you,'' and he said: ''That wasn't necessary to make your bed; you could lie right there in bed while I am here;'' and looked at her with a silly grin on his face and it rather made her mad.

On interrogation on cross-examination about what her inference was when Lowry made this remark she admitted that she understood that he was making some sort of a covert advance towards her and was thinking of himself in relation to her and that she didn't think that was right for her to remain in bed while he was there. She further said that she had a headache and was billious and that he sat there and said: ''I want to ask you a few personal questions,''

and that she said: "All right, what are they?" and that he said: "Well, who is paying your rent here?" and that she said: "We are in arrears we are not paying rent," and he said: "Who is feeding you?" and that she said: "Well, the money we are getting is a few dollars off the paper (her husband was running a small independent labor paper) and I am working extra at Grand Leader and that sets our table;" that he said "Who is buying your clothes?" and she said: "I haven't any new clothes, I am wearing clothes to work in that I am ashamed of;" that he looked at her and said: "Well, Mrs. Rohrmoser, I have a personal question. I know of a lot of men here in St. Louis that would pay to be with you," and she said: "What did you say?;" that he was then sitting on the north side of her and she was sitting on a chair right by a bay window on the southwest corner and that he made that remark twice; that she got it at first, but that it made her so mad she wanted him to repeat it to make sure; that by that time he got up and came to her and grabbed her dress, tore it clear down and grabbed her little finger and his finger nail went in there and made quite a deep gash and that by him getting her dress he bruised her on the chest and that she said: "You get up and get right out and don't ever come back here again" and that he said: "Oh yeah!" and at that time the door bell rang; that the person was Bernard Egan who lived in another part of the same apartment house and that she said "Oh, Bernard, I am so glad you are here;" that by that time she was crying and hysterical to think that a man would come into her home and assault her; that after Mr. Egan came in he said to Mr. Lowry: "Why, don't you know Mrs. Rohrmoser is sick today?" and Lowry said: "I am with the Household Finance Corporation and these people owe us money, I am here to collect it;" that Egan said: "The best thing you can do is to get your hat and get out. You can see she is sick, the condition she is in;" and that then Mr. Lowry left.

On cross-examination when asked to give her understanding of his queries about who was paying her bills and buying her clothes and food, etc., as to whether he was speaking for himself, she replied that she really couldn't say, that she didn't know whether he was thinking of himself when he spoke of knowing a lot of men who would like to meet her and pay her bills or not, that she had no opinion about that, but that she "was very nervous, and him talking about the bed and about the men;" that he spoke about the bed first and followed it up by talking about the business—the loan; that she told him they couldn't meet it right then and would be glad to do so when they could; that they were speaking agreeably then and he said: "I think you have ample enough furniture to sell to cover the loan, and in case you haven't enough we will be glad to take care of the balance" and then he said: "It doesn't seem to worry

you a bit'' and that she said: ''No, it really doesn't'' and that that was all that was said about the loan, and that he then began asking her these personal questions and that she got angry when he made that advance to her how he knew a lot of men who would like to meet her and be with her and pay her bills; that he was sitting down at that time on the settee with his hat in his lap and that she was sitting in the southwest corner of the living room and that when he made the remark she started to get up and that he, in fact, had got up first; that when he started to come to her, she went to him and was going to push him out the door and make him leave, when he grabbed her clothes and her hand, his finger nail scratching her little finger drawing the blood and that he held her real tight. She admitted not having lost any time from her work at the Grand Leader and admitted that she was rather annoyed at the efforts of the defendant to collect payments; that the defendant would allow them to make their payments after they had gotten behind; that they had paid their full amounts up to the time her husband got sick; that the company didn't try to take their furniture away, but told them several times that it was going to have to take it if they didn't make their payments, and they (she and her husband) said that it was all right if they wanted to, but that the company told them that it would rather have the money than their furniture. She further testified that she was thirty-five years old.

At the close of plaintiff's evidence the trial court gave and read to the jury an instruction offered by defendant's counsel directing a verdict for defendant, whereupon plaintiff took an involuntary nonsuit with leave to move to set the same aside.

Thereafter, in due time, plaintiff filed her motion to set aside the involuntary nonsuit on the ground that her evidence made a *prima facie* case for submission to the jury and on the further ground that it appeared from plaintiff's evidence and from admission by defendand that Lowry visited plaintiff's home as an agent of defendant for the purpose of collecting a bill and while engaged in said employment, and in the course thereof, without just cause or excuse, assaulted the plaintiff. This motion being overruled by the court, plaintiff duly perfected her appeal to this court.

It is apparent that the trial judge in ruling that plaintiff had not made a case which should be submitted to the jury, was of the opinion that Lowry, defendant's collector, was not, when he made the assault complained of, engaged in furtherance of the master's business and that the act was not within the scope of his employment.

We are of the opinion that the trial court ruled correctly on the instruction in the nature of a demurrer to plaintiff's testimony.

It will be noted that it was not alleged in the petition, nor shown

by the testimony adduced by plaintiff, that defendant, the employer, connived at or ratified the act of its collector in respect to the assault. It is not charged that defendant was negligent in its selection of Lowry as its collector. Therefore, if defendant is liable for the act of Lowry, its liability rests solely on the operation and effect of the *respondant superior* rule. Generally speaking, the rule may be defined as follows:

"A master is responsible for injury occasioned to a third person by any negligence or misconduct of which his servants are guilty. while acting within the scope of their employment." [6 Labatt's Mas. & Serv. Sec. 2224.]

In Whiteaker v. Chicago R. I. & P. R. Co., 252 Mo. 438, loc. cit. 458, 160 S. W. 1009, loc. cit. 1014, the rule is defined as follows:

"The general rule is that the maxim, '*respondeat*' applies when the servant, in the line of his employment about his master's business, seeks to accomplish his master's purposes, and in doing so acts negligently, or willfully and maliciously, or even contrary to his orders or criminally, in some instances. That general rule is hornbook doctrine and beyond dispute. The difficulty is in applying it to the circumstances and facts of each particular case, for it would be intolerable to hold the master liable when his servant was pursuing his own ends for his own purposes, and not the master's and in doing so commits a wrong. The employer of men would be in hard lines if that were the law."

In Wolf v. Terminal R. Assn. of St. Louis, 282 Mo. 559, loc. cit. 563, 222 S. W. 114, the Supreme Court makes its pronouncement in the following language, viz.:

"The fact that the act was done during the time of the servant's employment is not conclusive, nor is the motive of the servant so. The question is: Was the act done by virtue of the employment and in furtherance of the master's business? [Hinkle v. Railroad (Mo. Sup.), 199 S. W. 227.] 'Whose business was being done and whose general purposes were being promoted?' [Maniaci v. Express Co. (266 Mo. 633), 182 S. W. 981.] Was the servant acting in the line of his employment, about his master's business, and seeking to accomplish his master's purpose?" .

It is earnestly contended by counsel for plaintiff that the conduct, actions, language and insulting questions propounded by Lowry winding up with the assault on plaintiff were all in the course of his employment and that he was seriously proposing to plaintiff that he would procure these men who would be glad to pay her bills in order to be with her, so that she, by becoming a prostitute, would receive sufficient money from them so that she could pay off the bill he had for collection. In other words, that his purpose was to serve his master by collecting the bill by this method.

On the other hand, it is contended by counsel for defendant that Lowry was making this talk to her which wound up in the assault, for the purpose and with the intent to establish sexual relations with her himself and that he had radically departed from his master's business and that his suggestions about the other men and the assault were a part and parcel of his personal purposes and in no way connected with the furtherance of his master's business.

We are of the opinion that the latter contention is the correct one. In the first place his suggestive remark to plaintiff on first entering the room, that it was unnecessary for her to have gotten up out of bed, that she could have remained there in bed while he was there, was admittedly understood by her that he was making a covert advance to her and that she thought he was thinking of himself in relation to her. Her woman's intuition told her what he was driving at, and she said he looked at her with a silly grin as he made the remark about the bed and that it rather made her mad. Later, the discussion about the loan was carried on agreeably, she said, and it was wound up with the remark by him that "It doesn't seem to worry you a bit," to which she responded "No, it really doesn't." She then said that was all that was said about the loan. Then she said he began to ask her those personal questions and, in answer to a question propounded on cross-examination as to when she got angry, she replied as follows: "When he made that *advance to me,* how he knew a lot of men that would like to meet me, to be with me, to pay my bills.' (Italics are ours.) This answer is in line with her interpretation of his remark about the bed and clearly demonstrates that she realized that he was endeavoring to speak for himself and establish sexual relations with her himself. She evidently did not give his language the interpretation *at the time* that her counsel now urge.

Her able and ingenious counsel cite the following cases in support of their contention, viz.: [Haehl v. Wabash Ry. Co., 119 Mo. 325; 24 S. W. 737; Chisholm v. Berg's Market (Mo. App.), 78 S. W. (2d) 486; Maniaci v. Express Co., 266 Mo. 633, 182 S. W. 981; Whiteaker v. Chicago, R. I. & P. R. Co., 252 Mo. 438; loc. cit. 457, 160 S. W. 1009; Blumenfeld v. Meyer-Schmid Grocer Co., 206 Mo. App. 509, loc. cit. 526, 230 S. W. 132; Uptegrove v. Walker, (Mo. App.), 7 S. W. (2d) 734; Gray v. Phillips Bldg. Co. (Mo. App.), 51 S. W. (2d) 181; Scott v. St. Louis-San Francisco R. Co. (Mo. App.), 52 S. W. (2d) 459.]

None of these cases are analyzed by her counsel so that their applicability to the case at bar may be made to appear.

The Haehl case, *supra,* is a noted and leading case and relates to the act of a watchman employed by the railway company to keep trespassers off of its bridge. His duties necessarily required the use of force if he found them unwilling to go off upon request. The

watchman, after chasing a trespasser almost across the entire length of the bridge shot and killed him and the railway company was held liable for the reason that he was engaged in the performance of his duties which had not then been completed; that he shot *dum fervet opus* and so far as the evidence showed, he was engaged in no other than the master's business. The principle of liability in that case is set out as follows:

"The principle of *respondeat superior* applies only when what is complained of was done in the course of the employment. The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in and about his business and carrying out his purposes. He is then responsible, because the thing complained of, although done through the agency of another, was done by himself; and it matters not in such cases whether the injury with which it is sought to charge him is the result of negligence, unskillful or of wrongful conduct, for he must choose fit agents for the transaction of his business. But if his business is done, or is taking care of itself, and his servant not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has, and can have, no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed then the wrong is the purely personal wrong of the servant for which he, and he alone, is responsible."

The Chisholm case, *supra*, is a very recent case decided by this court and follows the principles laid down in the Haehl case. It holds that the act of the manager of a store in running into and knocking down and injuring a pedestrian on the sidewalk in front of the store (along which its goods and wares were displayed for sale) during a fight occurring through the manager's attempt to adjust a customer's complaint of being short changed was within the scope of the manager's employment so as to make his employer liable in damages for his acts that resulted in the injury to the pedestrian. The following excerpts from the Chisholm case are *apropos*:

"It appears to be conceded by defendant, Berg's Market, Inc., that Joseph Berg was acting in its behalf in attempting inside the store to adjust the complaint of Mrs. Woods about being short-changed, . . . .

"Counsel for defendant Berg's Market, Inc., argue that, at the time plaintiff was knocked down and injured, conceding, as it must be at this stage of the case, that it was Joseph Berg who knocked her down, Berg had passed out of the scope of his employment and was not then engaged in furthering the business of his employer, but was engaged in an attempt of his own, for his own private purpose,

to retaliate for having been 'cracked in the mouth' by Mrs. Woods' son, whom he was pursuing at that moment.''

. . . . . . .

Loc. cit. 491:

''It was clearly a business transaction of the store, and not a personal transaction of his own, which Berg was called upon as manager of the store to adjust. The corporate defendant had placed him in charge of its store for just such a purpose. It was while he was engaged in that very transaction that the fight started. The transaction had not been completed. A satisfactory adjustment had not been made, for Berg was struck in the mouth while he was trying to explain the matter to the claimant and her sons. Berg instantly retaliated by striking one of Mrs. Woods' sons, and, seeing the other about to strike him, turned, ran a few feet, and thus injured plaintiff.''

. . . . . . .

Loc. cit. 492:

''If the fight between Mr. Berg and Mrs. Woods' sons had arisen out of a dispute between them as to a claim against Mr. Berg personally, or because of some other matter personal to him, the fact that he was president and general manager and was in charge of Berg's Market, Inc., and the further fact that the fight took place in the store or on the premises would not have been sufficient to have rendered that defendant liable, for the reason that, notwithstanding those facts, Berg would not have been engaged in any business of his master at the time plaintiff was injured, but we have no such state of facts in this case.''

In the Maniaci case, *supra*, an express agent shot the plaintiff while the latter was signing a receipt for goods for which he had claimed an overcharge by the Express Company, and the Express Company was held liable for the assault on the ground that he was then engaged in settling the master's business. The court using this language:

''He and Joiner were in the midst of the very business which had called them together, at the time said shooting occurred. In addition thereto, the petition alleges that plaintiff was in the very act of signing the receipt when he was suddenly shot, etc.''

. . . . . . .

''It is not imposing too great a hardship upon either corporations or individuals, to require them to respond in damages to legitimate patrons, for unprovoked, wanton, and malicious assaults, inflicted upon them, while in the very act of settling their controversies with the agent of the carrier. The conclusion thus reached is fully sustained by the great weight of modern jurisprudence.''

In the Whiteaker case, *supra*, the Supreme Court held the railroad

company liable for the act of its conductor in kicking a trespasser off a freight train. In the course of the opinion the court said:

"Then general rule is that the maxim, *respondeat*, applies when the servant, in the line of his employment about his master's business, seeks to accomplish his master's purposes and in doing so acts negligently, or willfully and maliciously, or even contrary to his orders or criminally, in some instances. That general rule is hornbrook doctrine and beyond dispute. The difficulty is in applying it to the circumstances and facts of each particular case; for it would be intolerable to hold the master liable when his servant was pursuing his own ends for his own purposes, and not the master's, and in doing so commits a wrong. The employer of men would be in hard lines if that were the law. Between the two extremes of an obvious case of liability on one side and an obvious one of nonliability on the other, · lie many cases close to the border line dividing liability from non-liability.

"Both sides have cited cases of that sort from other jurisdictions, but our own cases are rich enough in learning to point the way to a proper disposition of the instant case, and on the authority of those cases we must hold with respondent on the point.

"Assuming Drake kicked respondent off the moving train, as we must under the verdict, there is not a particle of testimony tending to show he was acting for himself for private ends or otherwise than about his duties in ridding the train of a trespasser. We pause to ask: Are we to airily suppose that Drake was booting trespassers (unknown to him and with whom he had no personal quarrel) from his master's trains in the nighttime for the mere fun of it?"

In the Blumenfeld case, *supra*, the evidence disclosed that defendant's servant was driving a two-horse wagon across McKinley bridge and plaintiff was in a wagon in front and defendant's servant, and the latter's brother, engaged in a fight with plaintiff in order to force him to drive his wagon to one side so that defendant's wagon could pass him. It was there held by the court that the master was liable for the assault because the defendant's servant was at the time of the difficulty engaged in an effort to further his master's business, namely, the driving forward of his wagon across the bridge.

In the Uptegrove case, *supra*, the master was held for the act of the servant who had authority to give notice to vacate an apartment to tenants and did so, which resulted in a fight wherein plaintiff was injured, the court using this language:

". . . . there is evidence from which the jury might reasonably infer the assault was precipitated by Clark's attempt to serve plaintiff with notice to vacate the apartment. Defendant Walker testified that Clark was authorized to serve such notices and that the necessity therefor and the time of service were matters within

the discretion of Clark. In the light of this testimony it cannot be denied the jury were warranted in finding Clark was the agent of Walker and that he was in the line of his duty at the time the alleged assault was committed.''

In the Gray case, *supra*, a fight between two servants began and the master's foreman entered into the fight also injuring plaintiff and it was held that the foreman was acting within the scope of his employment in trying to preserve order and prevent discord among the employees of his master and therefore the master was liable.

In the Scott case, *supra*, the Kansas City Court of Appeals held it a question for the jury as to whether the assault committed by the employee of the railroad company was in furtherance of the employer's business, using this language:

''The defendant argues that Claxton, at the time of the assault, was not engaged in doing anything in furtherance of his employer's business; that the train had been stopped and was stationary at the time of the assault, and, therefore, the assault was a personal matter between Claxton and the plaintiff. This argument does not take into consideration the fact that Claxton had authority to control movement of trains in the yards; that he stopped plaintiff's train uncoupled the engine from the cars, and ordered that it remain stationary until he ordered it to be moved. Thus he was exercising authority over the train at the time of the commission of the battery. The jury from the facts and circumstances in evidence could infer that Claxton struck plaintiff for the purpose of compelling obedience to his orders. The case was for the jury. [State ex rel. Gosselin v. Trimble (Mo. Sup.), 41 S. W. (2d) 801, 804; Haehl v. Wabash, 119 Mo. 325, 24 S. W. 737; Uptegrove v. Walker, 222 Mo. App. 758, 7 S. W. (2d) 734].''

Several cases are cited by defendant in support of its contention of non-liability and many others might be invoked.

In State ex rel. Gosselin v. Trimble (Mo. Sup.), 41 S. W. (2d) 801, it was held that a taxicab company (employer) was not liable where the evidence showed that its taxicab was standing in front of a hotel when plaintiff's taxicab, in stopping to discharge passengers, hit it slightly, resulting in a harmless collision. The defendant's driver then walked over to plaintiff and struck him, saying with an oath ''Get that car off of mine.'' There was nothing to prevent defendant's driver from moving forward and removing the contact. The court, in part, said:

''If there is any evidence which would justify a jury in finding that the assault made on the plaintiff was incident to an attempt upon the part of defendant's driver to do his master's business, then we must hold that the case was for the jury. There was no evidence introduced concerning any direct authority given by defendant to its

driver; but it was within his implied authority to drive defendant's taxicab, protect the car in his possession from damage, and to eject trespassers. We must therefore determine whether there was any evidence to indicate that he was about the prosecution of such business, either in a rightful or wrongful manner. There was no evidence that the defendant's driver was attempting or making preparations to drive defendant's taxicab. The slight collision which did not result in any damage, had already occurred, and there was no evidence to indicate that defendant's driver was attempting to prevent or repair damage to the car. No one was attempting to procure passage without payment of fare; and there was no evidence indicating that the blow was struck for the purpose of coercing the plaintiff into moving his car. It was struck simultaneously with the command, not to break down an exhibited inclination to refuse compliance, but evidently as a mere reaction to sudden anger. There is no evidence whatever that the defendant's driver was attempting to perform any duty owing to, or to exercise any power conferred by, his master.''

In 18 R. C. L., p. 795, Sec. 254, the general doctrine in relation to ''Scope of Employment'' is stated as follows:

''Acts impliedly authorized or such as are within the scope of the employment—that is, wrongs for which the employer may be held accountable—are not susceptible of precise or even very helpful definition of any phrase or short form of expression. Each case must be determined with a view to the surrounding facts and circumstances—the character of the employment and the nature of the wrongful act. Whether the act was or was not such as to be within the employment's scope is ordinarily one of fact for the jury's determination. But if the departure from the employer's business is of a marked and decided character the decision of the question may be within the province of the Court. 'Where a servant steps aside from the master's business and does an act not connected with the business, which is hurtful to another, manifestly the master is not liable for such act, for the reason that having left the employer's business, the relation of master and servant did not exist as to the wrongful act;' . . . the law also recognizes that the servant is still an independent and responsible being, with capacity, which the master cannot efface or control, to engage in projects of his own, and does not include in the responsibility laid upon the master liability for those acts of the servant which are but the exercise of his freedom about his own affairs. . . . The general idea is that the employee, at the time of doing the wrongful act, in order to fix liability on the employer, must have been acting in behalf of the latter and not on his own account.''

In Collette v. Rebori, 107 Mo. App. 711, 82 S. W. 552, this court

held that an agent employed to collect accounts was not acting within the scope of his authority when he assaulted a creditor because that is not the recognized, usual or conventional means employed for the collection of a debt or one likely to bring about the settlement of a disputed account; and further that there was no evidence that the master was present when the assault was made or that he aided or abetted it.

The following language was used by the court:

"The distinction attempted to be drawn in this case is more subtle and astute than sound, and appears to be opposed to the long line of decisions in this and other states holding the master liable for the tortious acts of the servant when done in the course of his employment, whether authorized by the master or not, and is, in effect, overruled by the later case of Voegeli v. Pickel Marble & Granite Co., *supra*, where the Court said: 'The test is not the lawfulness or the unlawfulness of the means adopted by the servant to accomplish his master's business, but it is whether such means are so far incident to the employment as to come within its scope.' This language finds support in Dearmin v. Schnell, 71 Mo. App. 507; Ins. Co. v. Owens, 81 Mo. App. 201; Garretzen v. Duenckel, 50 Mo. 104; Greer v. Lafayette County Bank, 128 Mo. 558, 30 S. W. 319.

"The cases illustrating the application of this doctrine are legion, but are not all consistent. Some, like Jones v. Packet Company, are curious. The best considered cases hold that the master is liable to third persons for the negligent, fraudulent or tortious acts of his agent or servant when it is shown that the agent or servant was acting within the scope of his employment and that the act complained of was done as a means or for the purpose of doing the work assigned him by the master. To assault and beat a creditor is not a recognized or usual means resorted to for the collection of a debt, nor is it one likely to bring about a settlement of a disputed account. The evidence shows that when plaintiff returned to the store for the purpose (as he says) of amicably settling the disputed account and made known to Sansone his purpose, Sansone did not take up the settlement of the account with him, but without the least provocation assaulted and beat him, not for the purpose of settling or collecting the account, but to gratify his private malice against the plaintiff. He was not, therefore, about his master's business nor acting within the scope of any authority delegated to him by defendant. For these reasons the rule of *respondeat superior* does not apply.

"There is no evidence tending to show that defendant was present when the assault was made, that he aided or abetted Sansone in making it or counseled or advised him to make it, hence there was a failure of proof and the learned trial judge did not err in taking the case from the jury."

In Phillips v. Western Union Tel. Co., 270 Mo. 676, 195 S. W. 711, our Supreme Court *en banc*, in discussing the law and the facts, made *apropos* pronouncements as shown by the following excerpts from its illuminating opinion:

"The defendant Western Union Telegraph Company is a New York corporation engaged in the business of receiving, transmitting and delivering communications by telegraph between different places in the United States, including the City of St. Louis, in which it had offices for that purpose, among which was an office on the southwest corner of Olive Street and Grand avenue. Olive street, at that place, extends east and west, while Grand avenue crosses it, extending north and south. The defendant Kenzell, at the time of the injury, which occurred about December 28, 1912, was a messenger boy 16 years old, in its service, whose duty it was to deliver telegrams. The evidence tends to show that about 7 o'clock in the evening of that day the plaintiff was standing on Grand avenue in front of the show window of a candy store on the southeast corner, waiting for an approaching automobile to pass, so that she could step down into the street and cross to the southwest corner, on which the telegraph office was situated. A newsboy with a bundle of papers under his arm stood on the sidewalk about seven feet north of her when the defendant Kenzell came running from the east along the sidewalk on the south side of Olive street with a telegram in his hand, and said to the newsboy, 'Give me a paper.' The newsboy refused, when Kenzell snatched one from the bundle and ran, looking over his shoulder, and collided with the plaintiff with such force that she was knocked ten feet into Grand Avenue and very seriously injured.

. . . . . . .

"We cannot arbitrarily assume that, by the terms of his employment, he was forbidden to seek, while on these trips, his own pleasure or profit in any manner consistent with the performance of his whole conventional duty, . . .

"These principles are familiar to all, and are firmly embedded in the foundation of our jurisprudence, and we would not feel that it is necessary to mention them were it not that this unfortunate accident has already been the subject of adjudication by an appellate court of this State in a suit brought by the husband of plaintiff (Phillips v. Western Union Telegraph Company, 194 Mo. App. 458), in which the liability of the appellant was upheld. While this does not constitute an adjudication of the right in favor of this respondent, it is persuasive authority as the decision by a distinguished court of the same question, and is the only authority to which counsel has directed our attention bearing upon the question which seems to us to be the controlling one in this case.

. . . . . . .

"The most of us frequently send our servants to the post office or the store, or, if we have no one regularly employed to do these errands, expend a nickel or a dime for a special messenger for such purposes. Traveling salesmen in the employ of commercial houses go from store to store and house to house in the pursuance of their calling. Boys engaged in this employment frequently encounter their juvenile enemies and we, who employ them, do not think of worrying over our financial responsibility for the result. The youth who goes to the post office with our letter on a Fourth of July morning may carry a bundle of firecrackers and distribute them freely along the route, or the festive drummer on a holiday occasion may fall over a slight and quiet traveler, or the boy who carries a parcel may, at the same time, try to control his boon companion, the bull pup, with a string. Many of us have seen plainful accidents resulting from such conditions, but have seen no legal authority for holding the master liable in damages growing out of the rollicking movements of his servants, on the street, even though his own business may have taken them to the very place at that very time, unless he instigates the wrong which caused the injury.

"Nor are we prepared to hold that a corporation is, in this respect, subject to a more stringent rule of liability than a natural person."

In the case of Smothers v. Welch & Co., 310 Mo. 144, 274 S. W. 678, the facts were substantially as follows:

A female customer entered defendant's store for the purpose of buying a davenette and defendant detailed one of its salesmen to take her to an upper floor to wait on her, which the salesman did, and, as she sat on the davenette he showed her, to try it out, the salesman suddenly threw his arms around her and tried to have sexual intercourse with her. She resisted and after a lively scuffle got away from him suffering some physical injuries.

The Supreme Court held that she was not entitled to recover against the salesman's employer on the ground that in assaulting plaintiff he was not acting within the scope of his employment and in furtherance of his master's business and to accomplish the purposes of the master, but on the contrary, was pursuing his own ends for his own purposes.

The court, in so ruling and in disposing of the case, used the language which we quote, as follows:

"On the facts stated but one conclusion can be drawn; namely, that Kamine, in assaulting plaintiff, was not acting within the scope of his employment and in furtherance of his master's business and to accomplish the purposes of his master, but, on the contrary, was pursuing his own ends for his own purposes.

"Appellant asserts that the case made on her pleadings and proof falls within certain well-defined exceptions to the rule which confines

the master's liability for the acts of his servants to those done within the scope of their employment. The principle upon which the exceptions rest finds a fairly comprehensive statement in Ruling Case Law as follows:

" 'It is well-settled law that, in all cases where the employer owes a special legal duty to the public, he cannot shirk or evade it by committing its performance to another, but is bound absolutely to perform the duty, and is liable for a failure to do so in any respect whereby injury results to others, whether such failure results from negligence, or from the willful, wanton, or criminal conduct of the employee or agent to whom the duty is committed. Being bound to do the act or perform the duty, if he does it by another, the employer is treated as having done it himself.' [18 R. C. L. 792.]

"The principle thus stated, frequently invoked in cases involving the torts of employees, of carriers, is without application here. A merchant owes to his customer, who comes upon his premises by invitation, the positive duty of using ordinary care to keep the premises in a reasonably safe condition for use by the customer in the usual way; and this doubtless includes the duty of using ordinary care to employ competent and law-abiding servants. But that is the extent of his duty; he is not an insurer of his customer's personal safety. [Cobb v. Simon, 119 Wis. 597, 604, 97 N. W. 276, 100 Am. St. Rep. 909; Fairbanks v. Boston Storage Warehouse Co., 189 Mass. 419, 75 N. E. 737, 109 Am. St. Rep. 646, 13 L. R. A. (N. S.), 422; Bowen v. Ill. Cent. R. Co., 136 F. 306, 69 C. C. A. 444, 70 L. R. A. 915.]

"The judgment of the Circuit Court is affirmed."

A *fortiori*, in the instant case, when Lowry, after finishing his talk with plaintiff about the loan (which was his master's business) took up and pursued his personal questions resulting in the assault complained of, it becomes plainly apparent that he was not acting within the scope of his employment and in furtherance of his master's business, but on the contrary, was pursuing his own ends for his own purposes.

The trial court was not in error in failing to submit the issue to the jury. Where the evidence is free from conflicts and admits of but one conclusion the question resolves itself into a matter of law. [Wendorff v. Mo. State Life Ins. Co., 318 Mo. 363, loc. cit. 369, 370, 1 S. W. (2d) 99; State ex rel. Gosselin v. Trimble (Mo. Sup.), 41 S. W. (2d) 801.]

In the Wendorff case, *supra,* the court says:

". . . the plaintiff's case cannot be taken from the jury, for he has the right to have the jury pass on the credibility of the defendant's witnesses and the weight of their testimony, though uncontroverted. [Peterson v. C. & A. Ry. Co., 265 Mo. 479, 178 S. W.

182.] But the rule has its exceptions. When the proof is documentary, or the defendant relies on the plaintiff's own evidential showing (or evidence which the plaintiff admits to be true) and the reasonable inferences therefrom all point one way, there is no issue of facts to be submitted to the jury. [Darlington Lumber Co. v. Mo. Pac. Ry. Co., 243 Mo. 245, 147 S. W. 1052; Linderman v. Carmin, 255 Mo. 62, 164 S. W. 614; Warren v. N. Y. Life Ins. Co., 182 S. W. 98; Richey v. W. O. W., 163 Mo. App. 246, 146 S. W. 461.]"

In the case of State ex rel. Gosselin, *supra,* the court says:

"Relator further complains that the opinion of the Court of Appeals also conflicts with the holding of this Court in such cases as Goucan v. Atlas Portland Cement Co., 317 Mo. 919, 298 S. W. 789, that every favorable inference of fact must be made in favor of a plaintiff in ruling on a demurrer to his evidence. But 'where the evidence is free from conflict and admits of but one conclusion, the Court should withdraw the case from the jury.' [38 Cyc. 1534.] And as this Court has said: 'If, however, there was but one view to be entertained by reasonable men of his conduct, and that view adverse to him, the question resolves itself into a matter of law.' [Mockowik v. K. C. St. J. & C. B. R. R. Co., 196 Mo. 550, loc. cit. 567, 94 S. W. 256; Hite v. Metropolitan Street Ry. Co., 130 Mo. 132, 31 S. W. 262, 32 S. W. 33, 51 Am. St. Rep. 555.] Verdicts cannot be based on speculation or conjecture. [Hamilton v. St. L. S. F. Ry. Co., 318 Mo. 123, 300 S. W. 787; State ex rel. Wabash Ry. Co. v. Bland, 313 Mo. 246, 281 S. W. 690; State ex rel. Missouri Pacific Utilities Co., 298 Mo. 427, 250 S. W. 551; Rollison v. Wabash Ry. Co., 252 Mo. 525, 160 S. W. 994.]"

It is clearly apparent that the plaintiff herself construed Lowry's remarks, both as to the bed and as to the men, as covert advances and attributed her claimed hysterical condition to both incidents.

There can be but one legitimate conclusion drawn from the testimony and that is that Lowry, the employee, had radically departed from the furtherance of the work of the master and pursued his own personal quest for his own pleasure and the master is not liable for his acts while so doing.

It follows that the ruling and judgment of the trial court should be affirmed, and it is so ordered. *Becker* and *McCullen, JJ.,* concur.